No. 104,580

STATE OF KANSAS, *Appellee*, v. JEFFERY SWINDLER, *Appellant*.

(294 P.3d 308)

Opinion filed
February 15, 2013.

*Lydia Krebs*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Evan C. Watson*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Jeffery Swindler appeals his conviction for rape. He argues his conviction should be reversed on two grounds: (1) rape is an alternative means crime, and the State failed to present sufficient evidence to support each of the means upon which the district court instructed the jury; and (2) the district court erred in denying Swindler's motion to suppress incriminating statements and a drawing he provided law enforcement officers. Swindler also contends that the journal entry of judgment wrongly reflects that the district court imposed lifetime postrelease rather than lifetime parole and that the district court erred in imposing lifetime parole with electronic monitoring.

We reverse his conviction because his motion to suppress should have been granted, and we remand to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant Jeffery Swindler lived with his then girlfriend, M.M., and his two daughters from a previous relationship in a rental home owned by M.M.'s aunt, J.C. J.C.'s then-11-year-old daughter, L.C., M.M.'s cousin, occasionally spent the night at Swindler's residence. One night in late 2008, Swindler, M.M., and L.C. were in bed watching a movie in Swindler and M.M.'s bedroom. According to L.C., she fell asleep during the movie and awoke to find Swindler's finger in her vagina. L.C. told her mother about the incident in May 2009. Based on her allegation, the State charged Swindler with one count of rape under K.S.A. 21-3502(a)(2) (sexual intercourse with a child under 14 years of age).

Before trial, Swindler filed a motion to suppress incriminating statements, written confessions, and a drawing he provided to investigators during an interview at the Kansas Bureau of Investigation's Wichita office. In his memorandum in support of the motion to suppress, Swindler argued that the interview was a custodial interrogation and that his invocation of his right to remain silent was not honored by the officers conducting the interview, KBI Agent Ricky Attebury and Jeff Hawkins of the Sumner County Sherriff's office. Swindler argued that the statements he made after he invoked his right to remain silent were involuntary and inadmissible.

During the hearing on the motion to suppress, Attebury and Hawkins testified about the circumstances surrounding Swindler's interview. Hawkins testified that he had interviewed Swindler as a suspect for the first time at the Southwest Wichita Police Department Substation. At the conclusion of that interview, Hawkins invited Swindler to the KBI's Wichita office to take a polygraph examination.

Six days later, at a time scheduled to accommodate Swindler's work schedule, M.M. drove Swindler and his two daughters to the KBI office. M.M. and the two girls waited in a hallway while Swindler was interviewed, beginning at 8 a.m. Attebury testified that the interview room measured 8' x 8'; Attebury sat in front of the exit during the interview and examination. At the start of the in-

terview, Attebury advised Swindler of his *Miranda* rights. Attebury also provided Swindler a written form that indicated that the polygraph examination was voluntary and that Swindler could terminate the examination at any time. Attebury testified that the way for Swindler to terminate the interview was to "get up and walk out." Neither Hawkins nor Attebury was armed, and both were dressed in civilian clothes. No other officers were involved with the interview. Attebury testified that there are 10 to 12 plainclothes agents assigned to the Wichita office but that typically there were fewer than 6 in the office at the time the interview occurred. Swindler was not placed in any restraints during the interview; nor was any property, such as a driver's license or wallet, taken from him.

Shortly after the interview began, Hawkins left the room but was able to watch the interview on a monitor in another room. He testified that he did not watch the interview in its entirety. After Hawkins left the room, Attebury started the interview. At 10:02 a.m., Swindler took an 8-minute unescorted break. After the break, Attebury connected Swindler to the polygraph machine and conducted the examination, which lasted 46 minutes. Following the examination, Attebury informed Swindler that he failed the examination questions about whether he had ever touched L.C. in her "vaginal area." At that point, Attebury's questions became more direct and accusatory.

According to the video recording of the interview in the record on appeal, at about 11:20 a.m., the following exchange between Attebury and Swindler occurred:

"Attebury: Just tell me so we can move on. Ok. With the truth of it.

"Swindler: You want me to say 'Yes. I did it' and . . . .

"Attebury: Well, yeah, the details, yeah . . . .

"Swindler: . . . go on . . . .

"Attebury: Yeah, the details, so I, so I can figure out how to ask the questions . . . .

"Swindler: I can't give you the details. I don't know when I did it. I'm done. I want to go home. I'm done.

"Attebury: Let me, let me go ahead and talk, tell Jeff [Hawkins].

"Swindler: I can't give you the details of when it happened. You know. It's been so long. I can't remember if I touched a little girl's vaginal area. You know. I didn't

do it. You know. I don't know what the heck's wrong, but I didn't do it. I know I didn't do it."

The video shows Attebury then left the room and 3 minutes passed before he and Hawkins returned. Attebury testified at the suppression hearing that he suspended Swindler's interview to consult with Hawkins because Attebury thought Swindler was "close to invoking" his right to remain silent. When the two investigators re-entered the interview room, Hawkins questioned Swindler about the incident with L.C. Hawkins' questions were, like Attebury's, accusatory.

"Hawkins: Well what are we gonna do?

"Swindler: What are we gonna do?

"Hawkins: Well, I gotta, I gotta ask you [inaudible] Jeff. You know. Who am I dealing with, you know, are you this guy that goes around taking advantage of younger girls? Or is this something . . . .

"Swindler: I don't, I don't do that stuff. I don't mess around with little girls. Since I've got two daughters of my own. I've got to take care of my kids. I go to work. I bust my time. I go to work.

"Hawkins: I understand that. But, you know, I need to know where I'm at here. Is this something that just happened out of the blue, one-time thing, or is it something, you know, that's more far reaching than that.

"Swindler: [stuttering] Ok. Just to get this over with so I can go home. It's out of the blue. I need to go-I wanna go home. I gotta get work done. I gotta go to work so I can make some money for my kids and stuff so . . . .

"Hawkins: Well, tell me what happened."

During the next 2 hours, Swindler made incriminating statements, signed two written confessions, and drew a diagram of his hand to show how far his middle finger had penetrated L.C.'s vagina. The entire interview and polygraph examination lasted from 8:21 a.m. until 1:35 p.m., at which point Swindler was arrested.

The district court judge denied Swindler's motion to suppress. The district court ruled that (1) the interview was investigatory rather than a custodial interrogation; (2) law enforcement was not required to "scrupulously honor" Swindler's assertion of his right to remain silent in an investigatory setting; (3) Swindler did not "unequivocally invoke his right to remain silent"; and (4) Swindler's statements were voluntary.

J.C., L.C., Attebury, and Hawkins testified for the prosecution at trial. Over defense counsel's objections, the State offered Swindler's two written confessions and the drawing and played the video of Swindler's interview in which he orally admitted to inserting his finger into L.C.'s vagina. Attebury testified during cross-examination that, at some point during the interview, after his oral confession, Swindler nevertheless again denied touching L.C.'s vagina and said that he had fabricated the confession so he could go to work.

Swindler testified at trial that he had only admitted to touching L.C. during the interview because he wanted to go home, and because he wanted to take his children home. When asked why he wrote the confession, Swindler stated, "I was not getting through to the law enforcement there that I was understanding that I could go home, so I was doing this for them because they wanted to hear this, so I gave them a statement so I can get out of there and take my children to their house, and then I can go to work." Swindler denied ever touching L.C.'s vagina.

At the close of the evidence at trial, the district judge instructed Swindler's jury that, in order to find Swindler guilty of rape, it had to find that he "had sexual intercourse with L.C." The jury instructions defined "sexual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ[,] or any object."

The jury convicted Swindler of rape. The district court sentenced Swindler to life in prison without the possibility of parole for 25 years. While the transcript of the sentencing hearing reflects that the district court imposed "lifetime parole with electronic monitoring," the journal entry of sentencing indicates lifetime post-release supervision.

## DISCUSSION

### Alternative Means

"Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." *State v. Brown*, 295 Kan. 181, 193-94, 284 P.3d 977 (2012).

A criminal defendant has a statutory right to a unanimous jury verdict. See K.S.A. 22-3421; *State v. Rojas-Marceleno*, 295 Kan. 525, Syl. ¶ 13, 285 P.3d 361 (2012); *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010). In *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994), this court explained:

" 'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.' "

"Because jury unanimity is not required as to the means by which an alternative means crime is committed, unanimity instructions are not required in alternative means cases." *Rojas-Marceleno*, 295 Kan. at 544. Nevertheless, the State must meet a "supersufficiency of the evidence" requirement, *i.e.*, present sufficient evidence to permit a jury to find each means of committing the crime upon which it is instructed beyond a reasonable doubt. *Rojas-Marceleno*, 295 Kan. at 544. If the State fails to present sufficient evidence to support each means, reversal is required. *Rojas-Marceleno*, 295 Kan. at 544.

In *Brown*, we clarified how courts are to identify statutes that underlie alternative means instructions. 295 Kan. at 193 ("Identifying an alternative means statute is more complicated than spotting the word 'or.' "). We summarized the alternative means analysis as follows:

"[I]n determining if the legislature intended to state alternative means of committing a crime, a court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea, actus reus*, and, in some statutes, causation elements. Or, did the legislature list options within a means, that is, options that merely describe a material element or describe a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction, raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 295 Kan. at 199-200.

Swindler argues that rape is an alternative means crime and that the State failed to present sufficient evidence of each of the means in the elements jury instruction. Instead, the evidence was limited to penetration with his finger. At the time of the offense, K.S.A. 21-3502(a)(2) provided: "Rape is . . . sexual intercourse with a child who is under 14 years of age." Sexual intercourse was defined under K.S.A. 21-3501(1) as "any penetration of the female sex organ by a finger, the male sex organ or any object." Swindler argues that K.S.A. 21-3501(1) provides three distinct ways of committing the crime of rape: penetrating a female victim's sex organ with (1) a finger, (2) the male sex organ, or (3) any object.

We recently addressed this same issue in *State v. Britt*, 295 Kan. 1018, 287 P.3d 905 (2012), and held that K.S.A. 21-3501(1) does not create alternative means for committing rape. Rather, the language in the statute merely describes different factual circumstances by which a defendant might perpetrate the single *actus reus* of the crime, *i.e.*, penetration of the female sex organ. *Britt*, 295 Kan. at 1027. Swindler's argument lacks merit.

*Motion to Suppress*

Swindler's second issue on appeal is the denial of his motion to suppress his statements, written confessions, and the drawing.

Swindler has two distinct avenues of attack. First, under a *Miranda* analysis, Swindler argues that the officers gave him *Miranda* warnings in what ended up as a custodial interrogation and that he unequivocally invoked his right to remain silent. Under this avenue, according to Swindler, everything he said after invoking his right was per se inadmissible. The State's response to this line of argument is twofold: (1) the interview was not custodial, and thus Swindler was not entitled to protections under *Miranda*; and (2) even if Swindler was entitled to *Miranda* protections, he failed to invoke his right to remain silent unequivocally.

Swindler's second avenue of attack is based on a Fifth Amendment Due Process voluntariness analysis. He argues that, independent of the *Miranda* and invocation of his right to remain silent, the investigators' conduct compelled his confessions. The State re-

sponds that Swindler's statements were freely and voluntarily given.

We note at the outset that these two avenues run parallel to one another. Although both may turn on "voluntariness," the voluntariness of *Miranda* analysis references the voluntariness of the defendant's encounter with law enforcement, *i.e.*, whether an interview qualified as a custodial interrogation. Fifth Amendment Due Process analysis, on the other hand, references the voluntariness of the interrogated individual's eventual incriminating statements. See *State v. Morton*, 286 Kan. 632, 649, 186 P.3d 785 (2008) ("Unwarned inculpatory statements obtained through noncustodial interrogation, although not barred by *Miranda*, may nevertheless be inadmissible if they were obtained in violation of the due process voluntariness requirement.").

We address Swindler's arguments in reverse order because the Fifth Amendment Due Process voluntariness analysis is dispositive of the bulk of his claim. This minimizes the need for lengthy discussion of whether and when the interview evolved into a custodial interrogation and whether Swindler unequivocally invoked his right to remain silent after having received *Miranda* warnings.

*Fifth Amendment Due Process Voluntariness Analysis*

The primary consideration to be given to a criminal defendant's inculpatory statement is its voluntariness. *State v. Lewis*, 258 Kan. 24, 34, 899 P.2d 1027 (1995) (citing *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 [1985]). A court looks at the totality of the circumstances to determine whether an accused's confession was voluntary. *State v. Robinson*, 293 Kan. 1002, 1018, 270 P.3d 1183 (2012). Nonexclusive factors to be examined include:

"(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. [Citations omitted.].

. . . .

" ' "[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the con-

trary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." [Citations omitted.]' " *Gilliland*, 294 Kan. 519, 528-29, 276 P.3d 165 (2012).

K.S.A. 60-460(f) also governs the admissibility of confessions or statements by the accused:

"In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged [is admissible], but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

When challenged, the State has the burden to prove, by a preponderance of the evidence, that a defendant's statements were voluntarily made, *i.e.*, that the statements were the product of the defendant's free and independent will. *Gilliland*, 294 Kan. at 528; *State v. Edwards*, 291 Kan. 532, Syl. ¶ 5, 243 P.3d 683 (2010); *State v. Brown*, 286 Kan. 170, 172, 182 P.3d 1205 (2008).

The district judge's memorandum opinion primarily focused on *Miranda* analysis questions of custodial interrogation and unequivocal invocation. As to voluntariness, he simply stated that he had considered the voluntariness factors and the facts of the case and determined that Swindler's confessions and drawing were the products of his free and independent will. The judge also relied on a passage from *United States v. Washington*, 431 U.S. 181, 188, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977): "[I]t seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."

Swindler does not argue that the manner or duration of the interrogation; his ability to communicate with the outside world; his mental condition; his age, intellect, and background; or his proficiency with the English language negatively impacted on the voluntariness of his statements. He relies solely on what he characterizes as the unfairness of the officers in conducting the interrogation—specifically, their assurances that he was free to terminate the interrogation and leave at any time contrasted with their refusal to honor those assurances—to support his assertion that his statements were compelled.

As stated, we must consider the totality of the circumstances in determining the voluntariness of Swindler's confessions and drawing. In *State v. Stone*, 291 Kan. 13, 237 P.3d 1229 (2010), this court held that defendant Joshua Stone's incriminating statements made during a custodial interview were involuntary based on the totality of the circumstances, including:

"(1) the defendant appeared exhausted during the interrogation, which began at 1 a.m., and several of his responses were garbled and disorganized; (2) the detective made misleading and ultimately untrue statements regarding finding the defendant's semen on the pajamas of the 9-year-old victim; (3) the detective implied that if the defendant told the truth, the length of his sentence could be affected; and (4) the detective said the defendant would be viewed as a sexual predator unless he confessed." *State v. Robinson*, 293 Kan. 1002, 1020, 270 P.3d 1183 (2012) (citing *Stone*, 291 Kan. at 22-33).

In *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), this court held that defendant Jami Del Swanigan's confession was involuntary. Again, the court applied the totality of the circumstances test and relied on the following factors:

"(1) the law enforcement officers' repeated use of false information and evidence, (2) the combination of the tactics used by law enforcement, including threats to convey Swanigan's lack of cooperation to the county attorney and threatening to charge him with additional robberies unless he confessed, and (3) evidence of the defendant's low intellect and his susceptibility to anxiety." *Robinson*, 293 Kan. at 1019 (citing *Swanigan*, 279 Kan. at 37-39).

Both the *Stone* and the *Swanigan* decisions cautioned lower courts against extending their holdings beyond their particular facts. See *Stone*, 291 Kan. at 32 (indicating that any one of the

circumstances surrounding the interrogation, standing alone, might not have led the court to conclude the statements were coerced); *Swanigan*, 279 Kan. at 44 ("[A] broad reading of our opinion today is expressly discouraged."); *cf. Robinson*, 293 Kan. at 1020 (confession voluntary; distinguishing *Swanigan*); *State v. Ransom*, 288 Kan. 697, 706, 207 P.3d 208 (2009) (confession voluntary).

In this case, Swindler does not claim officers manufactured information or evidence in order to get him to confess, as was the case in *Stone* and *Swanigan*. But he argues that the investigators' bait and switch about his ability to terminate the interview and leave had the same coercive effect.

The video in the appellate record makes it very clear that Swindler wanted to exercise the power the investigators had initially guaranteed that he possessed. From the time that he said "I'm done. I want to go home. I'm done," it is obvious that Swindler wanted to terminate the interview and leave the KBI office. His girlfriend and two small children were waiting for him in the hallway, and he expressed his desire to go to work to provide for his children. He repeated that he was "done" and wanted to go home.

Swindler's first clearly inculpatory statement was not made until he had said that he was confessing "just to get this over with so I can go home." Instead of being allowed to leave, the investigators persisted in questioning him. In particular, we note that Attebury admitted he left the room to consult with Hawkins to avoid an expected invocation of Swindler's right to remain silent. Also, Hawkins met Swindler's repeated efforts to do what he had been told he was free to do with "Well, tell me what happened." The message of these investigators was unmistakable: If Swindler wanted to stop talking and leave, he needed to confess to raping L.C.

In short, the investigators set the rules of engagement and then did not hesitate to break them as soon as they thought Swindler might slip away without telling them what they wanted to hear. Under the totality of these circumstances, the State cannot carry its burden to show that Swindler's resulting oral confession, written confessions, and drawing were given voluntarily under the Fifth Amendment. The district judge's refusal to suppress the confessions and drawing was error.

### Miranda *Analysis*

Normally, when a motion seeks to suppress a confession obtained in an allegedly custodial interrogation, the court must first determine whether the interrogation was, in fact, custodial. If not, *Miranda* warnings are unnecessary.

"An appellate court reviewing a trial court's determination of whether an interrogation is custodial, makes two discrete inquiries. Under the first inquiry, the court determines the circumstances surrounding the interrogation, employing a substantial competent evidence standard of review. In determining if there is substantial competent evidence supporting the existence of the circumstances found by the trial court, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. [Citations omitted]. The second inquiry employs a de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter." *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012).

In *State v. Carson*, 216 Kan. 711, Syl. ¶ 5, 533 P.2d 1342 (1975), this court identified five circumstances bearing on whether a person questioned was subject to custodial interrogation. This list of factors has since been modified and grown.

"Factors to be considered in determining if an interrogation is investigative or custodial include: (1) the time and place of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts." *Warrior*, 294 Kan. 484, Syl. ¶ 2.

Swindler concedes that his encounter with Attebury and Hawkins started as merely investigatory rather than as a custodial interrogation. He argues that the encounter became a custodial interrogation either (1) when he was informed that he failed the polygraph evaluation or (2) when he said "I'm done. I want to go home. I'm done."

Swindler may be right, but, under the unique circumstances of this case, it does not matter. See *State v. Schultz*, 289 Kan. 334, 342, 212 P.3d 150 (2009); *State v. Ninci*, 262 Kan. 21, 38, 936 P.2d 1364 (1997).

There is no dispute between the parties here that Swindler received *Miranda* warnings when his interview and the polygraph examination got under way. He need not have been given them if what followed was not a custodial interrogation. But the fact that he was given them in this situation, *i.e.*, approximately 2 hours before in the same interview about the same crime conducted by the same investigators, inoculated any evolution of a mere investigatory encounter into a custodial interrogation from challenge, as long as he did not invoke any of the rights the warnings were designed to protect. Compare *State v. Grady*, 317 Wis. 2d 344, 766 N.W.2d 729 (2009) (precustodial *Miranda* warnings remained effective once encounter became custodial interrogation) with *State v. Appleby*, 289 Kan. 1017, 1046-47, 221 P.3d 525 (2009) (*Miranda* rights cannot be anticipatorily invoked in a context other than custodial interrogation); see also *United States v. Bautista*, 145 F.3d 1140, 1151 (10th Cir.1998) (law enforcement officers not free to give *Miranda* warnings and then ignore person's attempt to invoke any right thereunder because encounter is merely investigatory).

We therefore need not analyze whether the interview up until Swindler's "I'm done. I want to go home. I'm done" statement was, in fact, a custodial interrogation. We may simply assume that all or part of it was and note that he received the warnings the law required him to be given in such a situation.

The next question in a *Miranda* analysis would ordinarily be whether the defendant unequivocally invoked his or her right to remain silent. This question also need not be answered here.

In short, Swindler's first attempt to invoke his right to remain silent also marked the line we have identified above between his voluntary statements and involuntary statements under the Fifth Amendment. We need not decide whether Swindler's statement "I'm done. I want to go home. I'm done" was an unequivocal invocation of his right to remain silent, because we have already decided that anything after that statement was inadmissible as in-

voluntary under the Fifth Amendment. Swindler does not contend that anything he said before that point constituted an invocation of his right to remain silent, much less an unequivocal invocation of that right.

*Harmlessness Analysis*

Having decided that the district judge erred in refusing to suppress Swindler's confessions and drawing, we turn to whether that violation of Swindler's Fifth Amendment right to remain silent was harmless. A constitutional error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Here, there was no physical evidence offered at trial. The entire case turned on whom the jury believed, L.C. or Swindler. This means that the admission of Swindler's confessions and drawing was indescribably prejudicial. The erroneous admission of this evidence cannot be ruled harmless beyond a reasonable doubt, a point the State essentially conceded during oral argument. Swindler's conviction of rape must be reversed.

*Sentencing Arguments*

Because we determine that Swindler's conviction must be reversed, we do not reach his sentencing arguments.

## CONCLUSION

For all of the reasons detailed above, we reverse defendant Jeffery Swindler's conviction for rape and remand this case to the district court for further proceedings consistent with this opinion.