IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,862

STATE OF KANSAS,
*Appellee*,

v.

YESENIA SESMAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Legal analysis of *Miranda* violation questions about criminal defendant confessions to law enforcement is distinct from legal analysis of Fifth Amendment voluntariness questions.

2.

Under the totality of circumstances reflected in the record, the defendant in this case voluntarily confessed to detectives, and her incriminating statements were admissible at trial.

3.

The State is not permitted to impeach a defendant's version of events at trial with the defendant's post-*Miranda* silence. A fleeting violation of that rule in this case was harmless error, because the defendant's credibility was already thoroughly impeached by the State's evidence.

1

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed March 13, 2020. Affirmed.

*Meryl Carver-Allmond*, of Kansas Capital Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  This appeal arises out of Yesenia Sesmas' killing of her friend Laura Abarca and kidnapping of Abarca's newborn daughter. Sesmas appeals her jury convictions of first-degree murder, kidnapping, and aggravated interference with parental custody. She argues that her post-arrest confession was involuntary and that the State violated her due process rights at trial by mentioning her invocation of her rights. We hold that the confession was voluntary and that any violation of Sesmas' due process rights was harmless. We therefore affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Abarca gave birth to a daughter on November 11, 2016. The baby's father was Abarca's boyfriend, Manuel Gonzalez. The young family lived with Abarca's mother in an apartment in Wichita.

On November 16, Sesmas, an old friend of Abarca's, drove to Wichita from Dallas, Texas, and visited Abarca and the baby at the apartment while Gonzalez was at work. Sesmas seemed surprised that Abarca's mother also was at the apartment. Sesmas had recently miscarried, but told only Abarca about the miscarriage. Sesmas faked a

2

continued pregnancy to her friends and family. During her visit with Abarca, she said that she was interested in leasing an apartment in the same complex and asked if it had security. Sesmas also heard Abarca's mother say that she would have to go back to work the next day.

The next day, both Abarca's mother and Gonzalez went to work in the morning, leaving Abarca home alone with the baby. Gonzalez texted Abarca throughout the day and noticed she stopped responding about 1 p.m.

When Gonzalez returned home about 3:30 p.m., he noticed that the apartment's front door was open. He found Abarca dead on the couch; she had a gunshot wound to her forehead. There was no gun at the scene. The baby was missing.

Police began an investigation of the shooting and apparent kidnapping. They learned of Sesmas' November 16 visit and a second visit planned for November 17 from Whatsapp messages on Abarca's phone. The messages also showed that Sesmas and Abarca chatted until about 1:30 the afternoon of November 17; after 1:30 Abarca stopped responding but Sesmas continued sending messages.

Police accessed Sesmas' cell phone location information. Cell tower data showed Sesmas traveled from Dallas to Wichita before the murder, was near Abarca's apartment at the time of the murder, and returned to Dallas after the murder. Wichita police asked Dallas police to apprehend Sesmas.

Dallas police arrested Sesmas during the early morning hours of Saturday, November 19. She had a newborn baby girl with her, and DNA tests later proved that the baby was Abarca's daughter. Police also found a gun in a closet in Sesmas' home. Later tests established that the gun fired the bullet that killed Abarca.

3

Police took Sesmas to a Dallas police station for questioning. Early in the interview, Sesmas told Wichita Police Department Detective Michelle Tennyson that she did not speak English. Tennyson enlisted the help of a Spanish-speaking Dallas detective, Jose Ortiz-Vives, to translate during the interview. Ortiz-Vives collected Sesmas' personal information. She said she had two sons:  a 16-year-old who did not live with her and a 13-year-old who lived with her. Sesmas also said her 13-year-old niece was staying with her and her husband.

Ortiz-Vives gave *Miranda* warnings to Sesmas, and Sesmas said that she understood her rights. Ortiz-Vives then asked:

> "Ortiz-Vives:  Ok. Are you willing to talk with us?
>
> "Sesmas:  Just if a lawyer comes, how long do I have to wait?
>
> "Ortiz-Vives:  Uh, that could take quite a while. Ok. The lawyer won't be found here.
>
> "Sesmas:  Where do . . . in Wichita?
>
> "Ortiz-Vives:  Huh?
>
> "Sesmas:  Where at?
>
> "Ortiz-Vives:  I think that it would be there then."

After Ortiz-Vives further explained the *Miranda* form, Sesmas completed the form, checking "no" in response to the last question asking if she wanted to speak with police, and initialing this response. Sesmas pushed the form to Ortiz-Vives who

4

completed his portion. Immediately after Ortiz-Vives stopped writing on the form and pushed his chair back from the table, Sesmas began asking about her son and niece:

"Sesmas:  I just wanted to ask, why did they bring my children, like how they brought them and they have them here?

"Ortiz-Vives:  Because they couldn't be left in the house alone.

"Sesmas:  But my children didn't have clothes or anything and they took them out like that and no

"Ortiz-Vives:  No, they have clothes now.

"Sesmas:  Now they have clothes?

"Ortiz-Vives:  Ah-huh

"Sesmas:  And my husband is here too?

"Ortiz-Vives:  Huh?

"Sesmas:  My husband.

"Ortiz-Vives:  Yes, he is, he is here, but he won't leave here anymore.

"Sesmas:  He won't leave . . . ?

"Ortiz-Vives:  Ah-huh.

"Sesmas:  And the children?

"Ortiz-Vives:  Huh?

5

"Sesmas:  The children?

"Ortiz-Vives:  The children already left here. They are going, being given to, so they won't stay alone at the house, they are being given to CPS.

"Sesmas:  Ok.

"Ortiz-Vives:  And so they there, well, will contact some family so that then they can get them from there, from CPS.

"Sesmas:  He doesn't have the number, I don't know, my son doesn't know his dad's number so they'll give them to him. If you can.

"Ortiz-Vives:  Which is it? What number does he have?

"Sesmas:  316-[REDACTED].

"Ortiz-Vives:  Whose number is that?

"Sesmas:  My son's dad.

"Ortiz-Vives:  What is his name?

"Sesmas:  [gives son's father's name]

"Ortiz-Vives:  [clarifies name]

"Sesmas:  [clarifies name]

"Ortiz-Vives:  Where does he live?

"Sesmas:  In Wichita, Kansas.

6

"Ortiz-Vives:  In Wichita, ok.

"Sesmas:  He has his other brother, has his son, my other son.

"Ortiz-Vives:  Ok. So, are you willing to talk to us or?

"Sesmas:  And what is it you want to know?

"Ortiz-Vives:  Well, I am here. She is doing the investigation from there. She is a detective from Kansas, from Wichita and she is doing a criminal investigation, and, um, for that is why she is here. She is the one that, eh, to know.

"Sesmas:  What does she want to know? That if I killed her?

"Ortiz-Vives:  Ah-huh.

"Sesmas:  Is that what? But I didn't kill her, I didn't kill her. I gave, I gave a boy, because she told me that she was going to give me the girl, because I was pregnant and I lost my girl and she already aborted three times and didn't want the girl. And I told her that, if she'd give her to me, she told me she was going to give her to me, and I had already made my plans and everything, and I just wanted that scare her is all, I just wanted to scare her that's all, but I didn't know she had been killed and they gave her to me, but I didn't know that this had been done to her, I just found out about this yesterday.

"Ortiz-Vives:  Who is it that killed her?

"Sesmas:  A guy that I paid in Planeview Park, to go take the girl from the mom.

"Ortiz-Vives:  That you paid?

"Sesmas:  Yes, but I don't know him or anything, I was just in Planeview and I saw him and I asked him if he didn't know someone that could do a job of just taking the

7

girl away from someone and he told me that he, to give him $1000 dollars and that he would do it for me.

"Ortiz-Vives: You paid $1000 dollars?

"Sesmas: Ah-huh. But I just wanted him to take the girl away from her, I didn't want him to kill her or anything."

Ortiz-Vives relayed this exchange in Spanish to Tennyson in English. Ortiz-Vives then told Sesmas:

"[Tennyson] [s]ays that since you elected to, when you included in the document that you didn't want to talk to us, well, she can't ask, keep asking questions.

"Sesmas: And so well, then I have to take it off? Or how?

"Ortiz-Vives: If you wish.

"Sesmas: I'll take it off."

Tennyson produced a second *Miranda* form, like the first, in Spanish. Ortiz-Vives began to explain the form again. Sesmas interrupted, asking what time her husband would leave the police station and asking Ortiz-Vives to let her write a note to her husband that the police could pass on to him. Ortiz-Vives said they needed to finish the *Miranda* form before he could address that. He finished explaining the *Miranda* form. This time Sesmas initialed the blank marked "yes" in response to the final question asking if she wanted to speak with police.

After completing the second *Miranda* form, Sesmas eventually confessed to killing Abarca. She said that she and Abarca had been friends for seven years and that

8

both were pregnant that year. After Sesmas miscarried, she said, she asked Abarca if she would give Sesmas the child she was carrying. According to Sesmas, Abarca jokingly said yes. Sesmas did not tell anyone other than Abarca that she had miscarried because her husband was excited about the pregnancy.

Sesmas recited several versions of the exact series of events.

In the first version, Sesmas said that she went to Planeview Park and hired a man to take the baby for her. She said that she gave the man $1,000 and told him to bind and blindfold Abarca and bring the baby to her. She said the man went into Abarca's apartment and then brought her the baby, whom she took back to Texas. She claimed that she did not find out that Abarca was killed until she was already back in Texas.

When police asked Sesmas about the gun they found in her home, she moved to her second version of events. Sesmas said she bought the gun three or four weeks prior so that she could use it to threaten Abarca if she needed to. She said she gave the Planeview man the gun to use to kidnap the baby but that she told him not to "use" it. She said that he returned the gun to her when he gave her the baby.

Finally, in her third version of events, Sesmas said that she was the one who confronted Abarca with the gun. She said that she told Abarca to give her the baby, that Abarca told her she was crazy, and that she "grabbed the pistol and pointed it at [Abarca] . . . and said [she] was going to shoot" but did not want to shoot. Then Abarca moved; Sesmas pushed her; and the gun fired, hitting Abarca in the forehead. Sesmas took the baby and left, returning home to Texas and passing the baby off as her own.

After the interview with the detectives concluded, the State charged Sesmas with first-degree murder, kidnapping, and aggravated interference with parental custody.

Before trial, Sesmas moved for a hearing under *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), to determine the voluntariness of her confession.

The State argued that police did not interrogate Sesmas after she completed the first *Miranda* form indicating she wanted an attorney. Instead, the State argued, "they were responding to Ms. Sesmas' questions." According to the State, Sesmas then changed her mind, so the police properly re-*Mirandized* her. The State argued that, under these circumstances, Sesmas knowingly and voluntarily waived her right to an attorney.

Sesmas, on the other hand, argued that after she invoked her right to counsel, police misled her by saying that an attorney would have to come from Wichita. She said that then, "rather than stopping the conversation, these two detectives then continue to talk to her. And allow her to have this very friendly [nonconfrontational], but highly incriminating conversation." According to Sesmas, "then [the detectives] say, well, you want to talk about these family things that are important to you, but we need you to waive your constitutional rights to do that, she of course then does that." She also argued that Ortiz-Vives' dual role as interpreter and interrogator caused "great concerns about that and its impact on the voluntariness of this interrogation."

The district judge stated that he reviewed the transcript and video recording of the detectives' interview. He then ruled:

> "Ms. Sesmas was paying attention during the Spanish language *Miranda*, but did ask
> questions on page ten, eleven, and twelve that seemed to indicate that she would be
> willing to talk if a lawyer came, and then she asked questions about her children, where
> are they, how were they brought here, is my husband here too. But she initiated those
> questions about her children and her husband.

10

"The lawyer question is a little more troubling, and I'll admit that. But within a relatively short time, Ms. Sesmas changed her position, without any apparent influence, from declining to speak to the officers under *Miranda* to agreeing under *Miranda* to speak to the officers and answer questions.

"The fact that the statement was made that she is entitled to a lawyer, but the lawyer would have to come from Wichita and how long that would take, Detective Ortiz did not know. That is troubling to me. But without testimony from Ms. Sesmas, I don't know what effect that had on her. I can't speculate. But I can make an objective assessment of what her subsequent behavior and conduct was.

"She signed the second *Miranda* form after again being advised of it. In that second Miranda form, she agreed to speak to law enforcement on these issues. Once past the Miranda issues and the second *Miranda* form was signed, according to the video at 12:26:40, but once past the *Miranda* issues, the defendant was very engaged in answering questions."

The district judge also reviewed other indicia of voluntariness, including Sesmas' physical condition, apparent cohesiveness, and the length of the interrogation. The district judge noted that the "tone of the interview . . . was in no way coercive or threatening or intimidating." With respect to Sesmas' comments about her son and niece, the district judge said "[t]here were no promises made by law enforcement officers to her about anything that might happen in this case or anything about her kids concerning CPS or any other related matters to her kids." Ultimately, the district judge concluded that—despite his concerns about Ortiz-Vives' dual role and statement that it "could take quite a while" for a lawyer to arrive from Wichita—"under the totality of the circumstances . . . Sesmas knowingly, intelligently, freely, and voluntarily waived her *Miranda* rights." The district judge also concluded that Sesmas' confession was voluntary.

11

At Sesmas' jury trial, the State produced evidence of Sesmas' faked pregnancy and showed that Sesmas and Abarca never sent messages to one another about Abarca willingly giving Sesmas the baby. The State also introduced messages from Sesmas to friends and family claiming that she had given birth. An eyewitness testified she saw Sesmas at Abarca's apartment at the time of the murder, and doorbell camera footage from the apartment complex showed Abarca's truck there at that time. State witnesses also explained the DNA tests establishing the identity of the baby Sesmas had with her when she was arrested. And a ballistics expert testified that the gun found in Sesmas' closet was the one used to shoot Abarca. The expert also testified that the amount of force required to pull the trigger on the gun made it unlikely that it discharged accidentally.

Ortiz-Vives testified over a standing defense objection "pursuant to pretrial litigation" about Sesmas' interrogation and confession. Ortiz-Vives testified about reading Sesmas her *Miranda* rights the first time; he explained that she checked "no" at the bottom indicating that she did not wish to speak to the detectives.

Sesmas again objected, this time on the grounds that it was not appropriate to inform the jury that Sesmas originally asserted her right not to speak with police. The district judge overruled the objection, stating that "under the totality of the circumstances, I have to view it as a harmless error because she apparently wanted to talk, she again reiterated after a few minutes that she did want to talk, and she continued to talk." After the district judge's ruling, Ortiz-Vives finished detailing Sesmas' confession for the jury.

Sesmas put on no evidence. During closing, her counsel did not contest that she was the shooter but argued the killing was not intentional.

The jury convicted Sesmas as charged, and the district judge sentenced Sesmas to a hard 50 life term for the murder as well as 61 months for the kidnapping and 13 months

for the aggravated interference with parental custody. The district judge ran the lesser sentences concurrent to each other but consecutive to the hard 50.

DISCUSSION

*Voluntariness*

Sesmas argues that because she was told her son and niece were in Texas Child Protective Services (CPS) custody and it "could take quite a while" for an attorney to arrive from Wichita, her confession was involuntary, and its admission at trial was reversible error. This error was preserved for argument on appeal by her arguments at the *Jackson v. Denno* hearing and by her standing objection at trial. See *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014).

Sesmas' counsel clarified at oral argument before this court that this appellate challenge is limited to a Fifth Amendment due process theory; she does not directly assert on appeal that her *Miranda* rights were violated. See *State v. Swindler*, 296 Kan. 670, 677-78, 294 P.3d 308 (2013) (distinguishing *Miranda* challenges from Fifth Amendment due process voluntariness challenges).

That said, we note that Ortiz-Vives improperly reinitiated discussion about the crimes and their investigation after answering Sesmas' questions about her family. See *State v. Thurber*, 308 Kan. 140, 149-56, 420 P.3d 389 (2018) (defendant asking questions of law enforcement unrelated to investigation after invoking *Miranda* does not allow police to reinitiate interrogation). He asked Sesmas if she wanted to talk to detectives after she had invoked her right to remain silent, saying, "OK. So are you willing to talk to us or?" Sesmas does attempt to argue indirectly on appeal that this *Miranda* error should color our evaluation of the voluntariness of her confession. But analysis of *Miranda*

13

violation questions is distinct from analysis of Fifth Amendment voluntariness questions. "'[T]he Supreme Court has held that *Miranda* does not coincide with the constitutional standard of voluntariness, but is only a prophylactic procedure to aid in the [*sic*] determining the admissibility of confessions.'" *State v. Morton*, 286 Kan. 632, 649-50, 186 P.3d 785 (2008) (quoting 3 Ringel, Searches & Seizures, Arrests and Confessions § 24:5 [2d ed.1993]).

We review the voluntariness of a confession under a dual standard of review. Substantial competent evidence must support the factual underpinnings of the district judge's decision, and we evaluate the ultimate legal conclusion drawn from those facts de novo. As an appellate court, we do not reweigh evidence or assess credibility of witnesses. It is the prosecution's burden to prove voluntariness by a preponderance of the evidence under the totality of the circumstances. See *State v. Lowery*, 308 Kan. 1183, 1218, 427 P.3d 865 (2018); *State v. Gibson*, 299 Kan. 207, 214, 322 P.3d 389 (2014).

The following list of nonexclusive factors is typically considered:

> "(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language. [Citations omitted.]" *Gibson*, 299 Kan. at 214.

In addition,

> "[t]hese factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a

14

conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." *State v. Randolph*, 297 Kan. 320, Syl. ¶ 3, 301 P.3d 300 (2013).

Sesmas submits three reasons to overturn the district judge's ruling that her confession was voluntary:

"[She] began the interview at a disadvantage because she did not speak English fluently. She indicated she didn't want to talk to the officers without an attorney, but wa[]vered when, inexplicably, she was told that an attorney would have to be brought from Wichita, which would 'take quite awhile'. The officers promised she could have an attorney, but then essentially withdrew that promise by implying, 'But who knows when?' In the meantime, her children were in CPS custody, with Ms. Sesmas's husband also in jail and the children's father two states away."

These arguments essentially center on the fifth and sixth voluntariness factors, alleging law enforcement was unfair in conducting the interview and Sesmas was handicapped by her lack of English fluency. These arguments are unavailing.

First, while it is apparently true that Sesmas is not fluent in English, she ignores that Ortiz-Vives was brought in to translate Tennyson's English questions into Sesmas' native Spanish. The record shows that Ortiz-Vives is a certified Spanish translator in the Dallas Police Department. While use of an interpreter who was not also an interrogator would have been a better practice, Ortiz-Vives' dual role alone did not demonstrate, as the district judge noted, that his "translations were inappropriate or misstated, whether intentionally or unintentionally."

Second, Ortiz-Vives' statement that it "could take quite a while" for an attorney to arrive from Wichita may have been literally accurate because of the distance but somewhat misleading about the actual time it would take to bring in counsel to assist

15

Sesmas. Texas has attorneys too. But it is nevertheless clear that the statement could not have been a factor in forcing Sesmas to confess. *After* it was made, she had no trouble invoking her right to remain silent on the first *Miranda* rights form.

Third, Sesmas' emphasis on CPS's custody of her son and niece is unpersuasive. Sesmas started the conversation about her family members, asking questions about their whereabouts. Ortiz-Vives gave her straightforward, factual responses and made no threats or promises related to the subject matter of her questions. In fact, he allayed some of Sesmas' concerns, telling her that the children did have clothes and taking down her son's father's phone number to give to CPS. Sesmas had no reason to believe, and police did not lead her to believe, that her decision about whether to speak with police would affect her ability to see her children or alter their custody status.

On the totality of the circumstances in the record described above, substantial competent evidence supports the factual underpinnings of the district judge's decision that Sesmas' confession was voluntary and admissible.

*Reference to Invocation of Rights*

Sesmas next argues that the State violated her due process rights when Ortiz-Vives testified at trial that Sesmas initially declined to speak with the detectives. Sesmas relies on *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

In *Doyle*, the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619. The Court considered this rule a necessary partner to *Miranda*, because "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the

16

person arrested" and "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. at 617-618. A line of questioning constitutes a *Doyle* violation if it "center[s] on what was *not* said." *State v. Hernandez*, 284 Kan. 74, 91, 159 P.3d 950 (2007).

Whether an alleged *Doyle* violation infringes on a defendant's constitutional rights is a question of law; de novo review applies. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). If this court finds a *Doyle* violation, it then applies a constitutional harmless error analysis to determine if the State proved beyond a reasonable doubt that the error did not contribute to the verdict in light of the entire record. *Fisher*, 304 Kan. at 248; see *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

Here, Ortiz-Vives' testimony that Sesmas initially invoked her right not to speak to law enforcement by checking "no" on the first *Miranda* form crossed the *Doyle* line. We must therefore determine whether the error is reversible or harmless. When conducting this analysis, an error "must be scrutinized and viewed in the light of the trial record as a whole, not on each isolated incident viewed by itself." *Hernandez*, 284 Kan. at 95.

Sesmas argues that the error cannot be harmless because her credibility was central to the case; the jury's verdict hinged largely on whether it believed Sesmas' account that the gun discharged accidentally.

In *Fisher*, this court held that the State violated *Doyle* by impeaching the veracity of defendant Matthew Fisher's testimony by pointing out that he "[n]ever said a word about these things until today." 304 Kan. at 250. This court noted that such a violation flirted with disaster because Fisher's guilt "depended on whether the jury believed his

17

most sympathetic version of events." 304 Kan. at 250. Nevertheless, we held the *Doyle* violation was harmless error because

> "the prosecutor also thoroughly impeached Fisher's credibility by emphasizing the inconsistent content of the communications when Fisher was not silent. Any further negative impact on Fisher's credibility arising from the prosecutor's two references to Fisher's selective silence would have been strictly marginal, not enough to have had [a] reasonable possibility of contributing to the verdict." 304 Kan. at 250-51.

This case is similar. The State attacked Sesmas' credibility by eliciting Ortiz-Vives' testimony about Sesmas' evolving stories, including the apparent fabrication of an anonymous kidnapper-turned-murderer for hire. The State further argued that a common-sense interpretation of the physical evidence and facts undermined Sesmas' credibility. As the State pointed out, Sesmas' purported plan merely to threaten Abarca, take the baby, then return to Texas and pass the baby off as her own did not make sense. If Sesmas left Abarca alive but took the baby, Abarca could have immediately contacted law enforcement to report the kidnapping and regain custody. The State also introduced the ballistics expert's testimony that it was unlikely that the gun used in the killing could have discharged accidentally, as Sesmas insisted.

In short, the State thoroughly undermined Sesmas' credibility on several fronts. Ortiz-Vives' fleeting mention of Sesmas' invocation of her rights "would have been strictly marginal, not enough to have had reasonable possibility of contributing to the verdict." *Fisher*, 304 Kan. at 251. Any minimal harm also was mitigated by Ortiz-Vives' continuing testimony that Sesmas nevertheless immediately continued speaking to him. The *Doyle* violation in this case was harmless error.

18

CONCLUSION

The district judge did not err by admitting Sesmas' voluntary confession. While the State did violate *Doyle*, the violation was harmless. We affirm the judgment of the district court.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 119,862 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.