IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,184

ZIAD K. KHALIL-ALSALAAMI,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel, and denial of the right can lead to reversal of a jury verdict. Courts consider whether a reversible denial of the right occurred by applying a two-prong test stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A convicted defendant must first establish deficient performance, by showing that counsel's representation fell below an objective standard of reasonableness. Then, the defendant must show that the deficient performance prejudiced the defense.

2.

After a full evidentiary hearing about an ineffective assistance of counsel claim brought under K.S.A. 60-1507, an appellate court reviews a district court's findings of fact and conclusions of law under a mixed standard of review. The appellate court examines the record and determines whether substantial competent evidence supports the district court's factual findings and determines whether those findings support the district court's conclusions of law. The appellate court then reviews the conclusions of law de novo.

1

3.

A court considering whether ineffective assistance of counsel caused prejudice must ask if a defendant has met the burden of showing a reasonable probability the result of the proceeding would have been different but for counsel's deficient performance. The ultimate focus of inquiry must be on the fundamental fairness of the proceedings and whether, despite the strong presumption of reliability, the result of the proceedings is unreliable because of a breakdown in the adversarial process counted on to produce just results.

4.

On the undisputed testimony of counsel and the governing law as it has developed at the time of counsel's representation of the defendant, counsel's failure to challenge admission of the defendant's incriminating statements was deficient performance under the first prong of *Strickland*.

5.

In this case, when criminal defense counsel's deficient performance enabled the State to present one of the two pillars of its case to the jury, prejudice under the second prong of *Strickland* has been established.

Review of the judgment of the Court of Appeals in 54 Kan. App. 2d 235, 399 P.3d 264 (2017). Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed September 11, 2020. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded with directions.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause, and *David L. Miller*, of the same firm, was with him on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Bethany C. Fields*, deputy county attorney, *Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

PER CURIAM: This appeal arises from Ziad K. Khalil-Alsalaami's convictions on two counts of aggravated criminal sodomy. He was acquitted on a charge of rape. After trial and an unsuccessful direct appeal, Khalil-Alsalaami filed a K.S.A. 60-1507 motion, alleging ineffective assistance of trial and direct appeal counsel.

District Judge John F. Bosch denied Khalil-Alsalaami's motion, but a panel of our Court of Appeals granted Khalil-Alsalaami relief. We accepted this case on the State's petition for review of the Court of Appeals decision.

We affirm the Court of Appeals result, although we reach it via a different, less complicated route. We reverse Khalil-Alsalaami's convictions and remand his case to the district court for further proceedings because of trial counsel's decision to drop a pretrial challenge to the admissibility of his client's incriminating statements and a later failure to object when a journal entry describing the parties' stipulation to the voluntariness of those statements was admitted at trial.

FACTUAL AND PROCEDURAL BACKGROUND

Khalil-Alsalaami had a party at his house in May 2010. Among the guests was 13-year-old C.J. She had arrived at the party with her boyfriend, John Esquivel; his brother, Robert; and Roger Safford.

According to C.J.'s side of the story, Safford pressured C.J. to have sex with Khalil-Alsalaami in exchange for $40. Khalil-Alsalaami denies that he engaged in any of

3

the sexual acts C.J. described and argues he was tricked into admitting certain of the acts by law enforcement.

Investigation of C.J.'s allegations began after she told her mother of the party about two days after it occurred. The State ultimately charged Khalil-Alsalaami with rape and two counts of aggravated criminal sodomy.

While Khalil-Alsalaami was represented by Stephen Freed, the parties came before District Judge Paul E. Miller for a *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), hearing on the voluntariness of several incriminating statements Khalil-Alsalaami had made to police detectives during a 45-minute interrogation on the day of his arrest. Khalil-Alsalaami admitted during the interrogation that he had engaged in oral and anal sodomy with C.J.; he did not admit that he had engaged in vaginal intercourse with C.J.

Detective Ryan Runyan testified on behalf of the State at the hearing. He admitted that he knew Khalil-Alsalaami could not read English and that he therefore read a *Miranda* advisory aloud at the beginning of the interrogation, although he did not do so "word for word." Runyan further testified that Khalil-Alsalaami agreed to speak with the detectives, signed the *Miranda* rights waiver form, and never asked to stop the interview. In Runyan's view, Khalil-Alsalaami, whose first language is Arabic, could understand what was being said during the interrogation.

Because Freed said he was still trying to secure an expert witness, the defense portion of the *Jackson v. Denno* hearing was delayed.

Khalil-Alsalaami then retained attorney Barry Clark. Clark, along with Jeremy Platt, would represent Khalil-Alsalaami through the rest of pretrial proceedings, at trial, and on direct appeal.

Rather than complete the *Jackson v. Denno* hearing, Clark entered into a stipulation with the State that Khalil-Alsalaami's partial confession was knowing and voluntary. The stipulation was memorialized through a journal entry, which read in pertinent part:

> "[T]he Defendant stipulates that his statements to law enforcement were knowing and voluntarily given and he was not under any compulsion or no threats or promises were made to him.

> "**THEREUPON**, the Court, after reviewing the file and evidence presented, listening to statements of counsel, and being fully advised in the premises, finds as follows:

> "1.     The defendant's statements to Detectives Ryan Runyan and Sonia Gregoire were voluntarily given and shall be admitted at trial."

The journal entry was signed by Judge Miller, the prosecutor, and Clark.

The State's case at trial relied upon a videotape and transcript of Khalil-Alsalaami's incriminating statements, on C.J.'s account of events, and on expert testimony about a DNA match between semen found on the inside waistband and drawstring of a pair of shorts worn by C.J. on the night of the party and a known sample collected from Khalil-Alsalaami once he was arrested.

At trial the defense asserted that Khalil-Alsalaami had been tricked into falsely confessing to oral and anal sodomy with C.J. on his bed, because Runyan did not disclose C.J.'s age and minimized any legal problem that would arise from Khalil-Alsalaami admitting that he engaged in consensual sexual activity with an adult woman who was not his wife. In defense counsel's view, as expressed at trial, regardless of whether Khalil-Alsalaami's statements qualified as voluntary, the jury should understand that he did not actually confess to behavior he understood to be a crime; Khalil-Alsalaami thought he was merely falsely admitting to engaging in a noncriminal extramarital affair with an adult female.

Defense counsel also emphasized, throughout trial, that C.J.'s account of events changed from one not including anal sodomy to one including anal sodomy; that law enforcement had failed to follow up on specific, important lines of inquiry and witnesses; that Runyan had failed to audio record two of his discussions with Khalil-Alsalaami in which, according to the defense, Runyan pressured Khalil-Alsalaami and put words in his mouth; and that the Kansas Bureau of Investigation had failed to test or to compare forensic test results on certain items worn by C.J. or seized from Khalil-Alsalaami's bedroom. The defense also advanced a theory that the DNA found on C.J.'s shorts could have been transferred from Khalil-Alsalaami's bedding, because he had engaged in sex with a girlfriend in his bed earlier in the day of the party and C.J. had admitted being on the bed with her boyfriend during the party.

During Khalil-Alsalaami's cross-examination at trial, the prosecutor moved to admit the stipulation to the voluntariness of his incriminating statements to detectives. Defense counsel did not object. Khalil-Alsalaami testified that he was unfamiliar with the journal entry recording the stipulation. But the prosecutor used it to impeach his direct testimony that he had falsely confessed because he had been confused, pressured, and set up by Runyan's use of a minimization interrogation technique. Khalil-Alsalaami agreed

6

with the prosecutor that the journal entry recited that his statement was knowingly and voluntarily made. The prosecutor discussed the journal entry and Khalil-Alsalaami's testimony about it again during closing arguments.

The jury acquitted Khalil-Alsalaami of rape and convicted him on the two counts of aggravated criminal sodomy. That is, it acquitted Khalil-Alsalaami on the one count based on behavior he had denied engaging in at the time of his interrogation, and it convicted on the two counts based on behavior he had admitted engaging in at the time of his interrogation.

On direct appeal, Khalil-Alsalaami's counsel did not challenge the admission of his incriminating statements or the admission of the journal entry about the voluntariness of the statements. Other appellate arguments were rejected, and a panel of our Court of Appeals affirmed Khalil-Alsalaami's convictions and sentence. *State v. Khalil-Alsalaami*, No. 106,610, 2012 WL 5869581, at *1 (Kan. App. 2012) (unpublished opinion).

Khalil-Alsalaami then filed the K.S.A. 60-1507 motion underlying this appeal. He alleged that trial and appellate counsel provided ineffective assistance in 11 ways, including the following:

> "(c)    The Petitioner was denied the effective assistance of counsel in that trial counsel failed to investigate and file a motion to suppress challenging the voluntariness of the Petitioner's statement to law enforcement and, instead, stipulated that the Petitioner's statement was voluntary.

> "(d)    The Petitioner was denied the effective assistance of counsel in that trial counsel stipulated that the Petitioner's custodial statement to law enforcement was voluntary, knowing, and intelligent, and in failing to object when the stipulation was admitted as a State's exhibit during trial."

District Judge John F. Bosch held an evidentiary hearing on Khalil-Alsalaami's motion.

During Clark's testimony at the hearing, he admitted he never challenged the voluntariness of Khalil-Alsalaami's incriminating statements even though his client sometimes had difficulty understanding what Runyan was saying or asking him during the interrogation. Clark testified that he looked at factors he thought were "germane to the issue of voluntariness of confessions" and decided not to file a motion to suppress or complete the *Jackson v. Denno* hearing begun by his predecessor. Clark thought an argument that the statements were involuntary lacked merit, and he did not want to lose credibility in the eyes of the district judge.

Clark said he was unsure about whether Khalil-Alsalaami understood the *Miranda* form, and he acknowledged that Runyan could be heard on the interrogation recording saying that Khalil-Alsalaami cannot read English. Clark also testified that he did not challenge Runyan's failure to read aloud the portions of the waiver of *Miranda* rights form that asked, "Do you understand each of these rights I have explained to you[?]" and "Having these rights in mind, do you wish to talk to us now?" He said he was not concerned with Runyan's less-than-complete reading of the *Miranda* form because Runyan "explained each of the rights to [Khalil-Alsalaami] and asked him if he was willing to answer questions."

Clark agreed during his testimony that the pillars of the State's case were his client's incriminating statements and the DNA evidence. Thus, attacking the reliability of the statements was a key part of the defense, and part of the trial strategy was to show the jury that Khalil-Alsalaami was tricked into making a false confession. Clark admitted that it was possible he had not shown his client the journal entry recording the parties'

stipulation before trial and acknowledged that it did not bear Khalil-Alsalaami's signature. Yet he also said he had entered into the stipulation only after discussing its subject matter with Khalil-Alsalaami.

Clark's testimony on the damage done to Khalil-Alsalaami's defense by the admission of the journal entry at trial was inconsistent. He said that he did not believe the admission harmed the defense, because whether the statements were voluntary was not in issue; the issue was whether Khalil-Alsalaami was tricked into voluntarily confessing. But he admitted that he "should have objected" to the journal entry's admission and that he never intended for it to become a prosecution trial exhibit.

Platt testified at the 60-1507 hearing as well. He said that Khalil-Alsalaami participated in discussions with counsel about the incriminating statements made to the detectives. Platt confirmed that Khalil-Alsalaami "[w]as able to explain whether or not he felt there were promises" made by Runyan. Platt could not recall Khalil-Alsalaami asserting that such promises or threats were made. Platt agreed with Clark that there was no basis to dispute the voluntariness of the statements and that Khalil-Alsalaami was involved in that discussion too. Further, Platt said that he could not "recall [Khalil-Alsalaami] specifically" saying he agreed with counsel not to file a *Miranda*-based motion to suppress or to abandon the *Jackson v. Denno* hearing on voluntariness, "but we obviously discussed it with him and he never objected." Platt nevertheless conceded that the admission of Khalil-Alsalaami's statements was "very critical" to the case. After being confronted with his earlier statement in a deposition, Platt also admitted that he and Clark declined in part to challenge admission of Khalil-Alsalaami's statements in part because they "did not want to piss off Judge Miller," and did not "want to curry bad favor with the judge on a motion that" they believed to be meritless.

9

Khalil-Alsalaami also testified at the hearing on his K.S.A. 60-1507 motion. He repeated his statement at trial that he had never seen the stipulation entered into by his counsel, and he said that counsel had never asked him about it or discussed it with him pretrial. As for the underlying interrogation, he testified that there were parts of it he understood and parts he did not. For example, he said, he did not understand the *Miranda* rights Runyan had read to him. Khalil-Alsalaami also testified that he knew police in his native country of Iraq tortured people until they confessed.

Judge Bosch listed several numbered findings of fact in a written ruling denying Khalil-Alsalaami's K.S.A. 60-1507 motion. He also recited additional material that may have been intended to be factual findings, some dependent on credibility judgments. Those portions of the ruling the judge evidently believed to be related to the performance of Clark and Platt on the ultimate admission of Khalil-Alsalaami's incriminating statements adopted the State's written response to the K.S.A. 60-1507 motion, including the following:

- Clark listened to the defendant's statement and viewed the videotape of his interrogation.
- Clark reviewed the police reports.
- Clark gave the police reports to the defendant.
- Clark discussed the circumstances leading up to the incriminating statements with the defendant.
- Clark examined the factors germane to voluntariness and *Miranda* waiver.
- Clark weighed the factors for and against voluntariness.
- Based on his investigation and research, Clark concluded that the defendant understood his *Miranda* rights, that his statement was voluntary, and that a challenge would be meritless.
- Clark believed the decision "paid dividends."

10

- Clark, Platt, and the defendant discussed the merits of challenging the voluntariness of his statement; the defendant was aware of the decision not to pursue a challenge; and the defendant did not object to the decision.
- The defendant agreed with the decision.
- At trial, the defendant admitted on cross-examination that he was not threatened and promises were not made to him to induce his incriminating statements.

With this foundation in place, on the two allegations of ineffective trial counsel that we regard as dispositive today, Judge Bosch concluded as a matter of law:

"Mr. Clark's decision to not challenge the voluntariness of the defendant's statement was an informed decision based on his professional judgment after a reasonable and thorough investigation . . . . A review of the facts readily demonstrates that the petitioner's statement to Detective Runyan was the product of his free and independent will. Thus, even if Mr. Clark had moved to suppress the petitioner's statement, it would have been unsuccessful. As a result, the petitioner has failed to show prejudice as a result of Mr. Clark's decision not to challenge the voluntariness of the statement and his claim of ineffective assistance of counsel must also fail.

. . . .

". . .Trial counsel can be ineffective when he stipulates to facts that clearly undercut his defense. But that is not what occurred in the present case. As explained by Mr. Clark, the defense was not that the statement was involuntary. The decision to not challenge the statement did not undercut the trial defense.

"Finally, the petitioner argues that Mr. Clark was ineffective when he failed to object to the State offering the journal entry of the *Jackson v. Denno* hearing. Mr. Clark admits in hindsight that he should have objected to the introduction of the journal entry . . . . But simply because Mr. Clark now believes he should have objected does not

11

necessarily mean that the first prong of the *Strickland* standard [requiring deficient performance] has been satisfied. Rather, the test requires the petitioner to show that counsel's representation fell below an *objective* standard of reasonableness, considering all the circumstances of the case. It is not what Mr. Clark now believes, but rather what was then objectively reasonable. In light of the petitioner's testimony [that his statements were voluntarily given] immediately preceding the admission of the journal entry, it was not objectively unreasonable for Mr. Clark to not object.

". . . Nothing prevented the petitioner from contesting the circumstances surrounding the making of the confession which were fully covered at trial.

"Even if Mr. Clark's failure to object was unreasonable . . . , [t]he petitioner could not be prejudiced by the admission of a document that establishes what the petitioner had just admitted in front of the jury. The journal entry established no more than what the petition had just admitted. Even if it was error to admit the journal entry, it was harmless error, and the petitioner was not prejudiced from admission of the same."

Khalil-Alsalaami appealed Judge Bosch's decision, and a panel of our Court of Appeals unanimously reversed and remanded. The panel ruled that Khalil-Alsalaami's counsel had not met the constitutional standard for effective assistance of trial or appellate counsel and that, but for counsel's deficient performance, there was a reasonable probability that the outcome of the proceeding would have been different. *Khalil-Alsalaami v. State*, 54 Kan. App. 2d 235, 246-47, 399 P.3d 264 (2017) (citing *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 [2014]) ("reasonable probability" means probability sufficient to undermine confidence in verdict).

Initially, the panel focused on one of Khalil-Alsalaami's allegations of ineffectiveness of trial counsel we need not and do not reach today—the failure of Clark and Platt to obtain an interpreter at trial to ensure the exercise of their client's constitutional rights to confront the witnesses against him and to be present at every

12

critical stage of the proceeding. Again, Khalil-Alsalaami's first language is Arabic. Among other things, the panel ruled that factual findings made by Judge Bosch on the way to ruling in favor of the State on this issue were unsupported by substantial competent evidence, particularly in view of contrary expert testimony on Khalil-Alsalaami's limited understanding of English presented at the hearing on his K.S.A. 60-1507 motion. The panel also stated that prejudice from counsel's error should be presumed, relying on *State v. Calderon*, 270 Kan. 241, 246, 13 P.3d 871 (2000), and K.S.A. 75-4351 ("qualified interpreter shall be appointed . . . for persons whose primary language is one other than English"). 54 Kan. App. 2d at 244-45. But the panel continued: "Although we could end our analysis here and reverse . . . , there were other significant errors committed by trial counsel that further bolster the ultimate result here. We choose to address those as well." 54 Kan. App. 2d at 246.

The panel then catalogued several other infirmities it detected in counsel's performance at trial and on appeal, which included failure to challenge admissibility of Khalil-Alsalaami's incriminating statements by completing the *Jackson v. Denno* hearing begun by Freed or by pursuing a defense motion to suppress, as well as stipulation to the voluntariness of Khalil-Alsalaami's incriminating statements.

The panel summarized in a section on the cumulative error doctrine at the end of its opinion:

> "We find that the number of errors is substantial, and even if the State could successfully argue that the impact that any one of them had on the trial was insignificant, we cannot ignore the fact that the accumulation of these errors impacted [Khalil-Alsalaami's] ability to receive a fair trial. The errors went to the heart of Clark's defense strategy." 54 Kan. App. 2d at 262.

13

The State filed a petition for review asserting that the Court of Appeals erred in holding that Khalil-Alsalaami received ineffective assistance of counsel on several grounds and attacking the panel's cumulative error conclusion based on what the State believed was flawed analysis of individual allegations of deficient performance.

DISCUSSION

The standards governing our review of cases in which a criminal defendant alleges ineffective assistance of counsel are often recited, including very recently in *Balbirnie v. State*:

"The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel, and denial of the right can lead to reversal of a jury verdict. Courts consider whether a reversible denial of the right occurred by applying a two-prong test stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A convicted defendant must first establish deficient performance, by showing that counsel's representation fell below an objective standard of reasonableness. Then, the defendant must show that the deficient performance prejudiced the defense.

"After a full evidentiary hearing about an ineffective assistance of counsel claim brought under K.S.A. 60-1507, an appellate court reviews a district court's findings of fact and conclusions of law under a mixed standard of review. The appellate court examines the record and determines whether substantial competent evidence supports the district court's factual findings and determines whether those findings support the district court's conclusions of law. The appellate court then reviews the conclusions of law de novo.

"A court considering whether ineffective assistance of counsel caused prejudice must ask if a defendant has met the burden of showing a reasonable probability the result of the proceeding would have been different but for counsel's deficient performance. The

14

ultimate focus of inquiry must be on the fundamental fairness of the proceedings and whether, despite the strong presumption of reliability, the result of the proceedings is unreliable because of a breakdown in the adversarial process counted on to produce just results." *Balbirnie*, 311 Kan. ___, Syl. ¶¶ 1, 2, 3, 468 P.3d 334 (2020).

Further, a reviewing court is prohibited from reweighing the evidence, evaluating the credibility of witnesses, or resolving factual conflicts. *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 (2007). Substantial competent evidence is "evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009).

As the United States Supreme Court has outlined, when judging trial counsel's performance, the "inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688-89. After a thorough investigation of the facts, strategic decisions made by counsel are "virtually unchallengeable," unless "'counsel lacks the information to make an informed decision due to inadequacies of his or her investigation.'" *Sola-Morales v. State*, 300 Kan. 875, 887, 335 P.3d 1162 (2014) (quoting *State v. Gonzales*, 289 Kan. 351, 358, 212 P.3d 215 [2009]). "The ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696.

15

*Deficient Performance*

Were we to follow the Court of Appeals panel's lead in this case, resolution of the interpreter issue would require us to address several novel questions for this court. First, is the language in K.S.A. 75-4351 mandatory or merely directory when it provides that interpreters "shall" be provided when a suspect's or defendant's first language is not English? See *State v. Ahmedin*, No. 105,378, 2012 WL 1919925, at *9 (Kan. App. 2012) (unpublished opinion). Second, if the statute is mandatory, can the right it bestows on a criminal defendant be waived, and, if so, how? See also *State v. Pham*, 281 Kan. 1227, 136 P.3d 919 (2006) (direct appeal holding admission of statements made during interrogation without interpreter not error; defendant had refused interpreter when asked if he wanted one present for questioning). Third, can counsel's failure to challenge lack of an interpreter during a client's interrogation or failure to seek an interpreter at trial ever qualify as ineffective assistance, and, if so, under what circumstances? Fourth, if ineffective assistance is shown on an interpreter issue, is the error to be classified as structural error that is automatically reversible, or does it demand prejudice analysis under *Strickland*? See *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1911-12, 198 L. Ed. 2d 420 (2017) (prejudice analysis required when otherwise structural public trial challenge arises on collateral attack). Among other things, the last of these questions would demand our evaluation of the staying power of this court's structural error holding in the direct appeal that was before us in *Calderon*, 270 Kan. at 251-54. A Court of Appeals panel has since attempted to distinguish that holding in *State v. Dosal*, No. 89,436, 2004 WL 795898, at *1 (Kan. App. 2004) (unpublished opinion).

But, as mentioned above, we are convinced that there is a more straightforward path to resolution of this case. It means we need not answer these questions. It also means we need not assess whether, as the State insists, the Court of Appeals panel exceeded the limitations on its appellate oversight when it examined the entire record and concluded

16

that Judge Bosch lacked substantial competent evidence to support his fact-finding or his conclusion that Khalil-Alsalaami possessed adequate English proficiency to proceed to trial without an interpreter.

Instead, we can merely accept defense counsel's uncontested testimony on the contours of the chosen trial strategy, validated by the record of Clark's and Platt's performance at trial. Clark was very clear both at trial and at the hearing on the motion underlying this appeal. His aim, with Platt's help, was to persuade the jury that his client was tricked into falsely incriminating himself by a law enforcement officer who withheld critical information—information that would have enabled Khalil-Alsalaami to determine before confessing whether the behaviors he was admitting qualified as Kansas crimes.

This is our problem: Even accepting that this strategy was consciously pursued, it makes little to no legal or common sense. As such, it does not qualify as strategy at all, much less a reasonable one, under *Strickland*.

From a legal perspective, Khalil-Alsalaami was not facing life in prison because he was accused of knowing he was breaking the law when he had sex with C.J. He was facing life in prison because he was accused of having sex with C.J., period. His knowledge or lack of knowledge of Kansas law was simply irrelevant to guilt or innocence.

Perhaps more important, Khalil-Alsalaami's knowledge or lack of knowledge of Kansas law bore no logical relationship to whether he was lying or telling the truth when he admitted to the conduct underlying the two sodomy counts. When it comes to sexual activity with a 13-year-old girl, a confession obtained by trickery is still a confession. The jury demonstrated its keen understanding of this reality with its split verdict—convicting on the crimes Khalil-Alsalaami admitted to and acquitting on the crime he denied.

17

When defense counsel is confronted with a situation in which his or her client has already admitted to conduct that, as a matter of law, makes the client guilty of a charged crime, to be effective, counsel must flyspeck the circumstances that led to the incriminating statements and, if factually and legally supported, challenge the State's effort to place the statements before the jury. The ideal time to do this in the first instance is pretrial. If unsuccessful pretrial, effective counsel must also challenge admission of the incriminating statements through objection at trial. See K.S.A. 60-404. This objection gives the trial judge a chance to reconsider; it also preserves the admissibility issue for appeal.

The two K.S.A. 60-1507 motion allegations we focus on deal with the failure of Clark and Platt to challenge admission of Khalil-Alsalaami's incriminating statements pretrial or during trial, including failure to object to admission of the stipulation that the statements were voluntary and knowing before the jury. These challenges are intertwined and we examine them together. In order for us to rule that Clark and Platt provided ineffective assistance of counsel, we analyze whether they would have had anything to work with in mounting such challenges.

Admission of a criminal defendant's incriminating statements, among other things, may be challenged as involuntary under the Fifth Amendment, or as obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), or both. See *State v. Swindler*, 296 Kan. 670, 677-78, 294 P.3d 308 (2013). They may also be challenged as obtained in violation of an independent statutory right of the suspect, such as a right to have an interpreter present during interrogation.

Clark and Platt freely admit they made none of these arguments. Instead, according to their own testimony, they dropped Freed's *Jackson v. Denno* contest,

18

pursued no motion to suppress of their own, and stipulated that their client's confession to the conduct charged in two of three counts was knowing and voluntary. They did this because they did not think Freed's voluntariness challenge had merit because Khalil-Alsalaami had told them he was neither threatened nor promised any benefit before confessing. In addition, in Platt's vernacular, they did not want to "piss off" the judge who would try the case. Clark testified that he thought this approach paid off when the judge ruled in the defense's favor on a close issue under the rape shield statute, allowing evidence that C.J. was observed "making out" with her boyfriend after the alleged crimes. See K.S.A. 2019 Supp. 21-5502.

There are several ways in which counsel's assessment of and reaction to the information in their possession was legally unsound, and we hold today that they and Judge Bosch should have recognized as much.

First, as the Court of Appeals put it, the voluntariness of Khalil-Alsalaami's confession was not a "foregone conclusion." 54 Kan. App. 2d at 253.

Voluntariness of a confession is a mixed question of fact and law. See *State v. Sesmas*, 311 Kan. 267, 275, 459 P.3d 1265 (2020). It does not rise and fall solely on a suspect's subjective perception of the existence of a threat or promise. And counsel's decision not to challenge voluntariness is not insulated by the fact that he or she obtains his lay client's consent not to contest the issue.

To determine whether a statement is voluntary, courts evaluate the totality of the circumstances including: "the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation." *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 2, 106 P.3d 39 (2005). Analysis of the suspect's English

19

proficiency also should be considered. *State v. Garcia*, 243 Kan. 662, Syl. ¶ 8, 763 P.2d 585 (1988), *disapproved of on other grounds by State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992). Ultimately, "[t]he essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused." *Swanigan*, 279 Kan. 18, Syl. ¶ 2.

Clark testified that he evaluated these factors in deciding to forego completion of Freed's *Jackson v. Denno* hearing and filing of a defense motion to suppress, but this blanket statement, adopted and embraced by Judge Bosch, conflicts with his other, more factor-focused testimony in the 60-1507 hearing. Those passages in the record demonstrate that Clark was aware that three of the five voluntariness factors this court has enumerated would have cut in favor of the defense.

Clark knew, for example, that Khalil-Alsalaami's background did not necessarily prepare him for the American justice system. He believed his client had been resident in the United States "[p]erhaps a year and a half." Clark not only knew of grounds on which to attack the fairness of the interrogation; his "trial strategy" effectively gambled the entire case on the unfairness of Runyan's employment of a minimization technique designed to trick Khalil-Alsalaami into confessing to conduct he did not know was criminal. On English proficiency, Clark knew that Runyan said during the interrogation that Khalil-Alsalaami could not read English, and Clark could observe for himself that Khalil-Alsalaami could not understand some spoken English. He admitted during the 60-1507 hearing that there were words used in his client's interrogation that Khalil-Alsalaami could not understand.

Clark and Platt also clearly had a *Miranda*-based arrow in their pretrial quiver. Clark knew that Runyan had given Khalil-Alsalaami something less than a "word-for-word" recitation of his *Miranda* rights. Clark testified that he had watched the videotape

20

of the interrogation. Without obtaining any independent evaluation of his client's language ability, which did not "occur" to him, Clark "believed" that his client could understand the oral Miranda warnings given "pretty quickly" but he did not "know" if he could. He did know that Runyan had not read the waiver of rights portion of the usual *Miranda* form to Khalil-Alsalaami. He admitted that Runyan never asked his client whether he wanted to give up his right to have a lawyer present for questioning and that Khalil-Alsalaami never said that he wanted to give up his rights. Any waiver of *Miranda* rights would have to have been implied, a question for a judge that hears a motion to suppress.

Clark and Platt might also have challenged the State's planned admission of Khalil-Alsalaami's incriminating statements pretrial because there was no interpreter appointed to assist their client during interrogation, and he was not asked whether he wanted to waive such an appointment under K.S.A. 75-4351. Clark acknowledged during his testimony at the K.S.A. 60-1507 hearing that he had been aware of the interpreter statute at the time he represented Khalil-Alsalaami and believed it to be directory rather than mandatory. However, he did no research to determine if he was correct. In fact, as outlined above, the statute was and is open to interpretation by this court. Clark also admitted during his testimony that the plain language of the statute, for which this court has exhibited a deep affection, see *State v. Ballou*, 310 Kan. 591, 606, 448 P.3d 479 (2019), included "shall" and did not mention the possibility of a waiver.

Finally, we must comment briefly on counsel's expressed intention to avoid angering the trial judge by aborting the *Jackson v. Denno* hearing and avoiding pursuit of a motion to suppress. We understand that judges are human and that experienced defense counsel must size up and react to any individual judge's—or collective jury's—apparent patience for arguments that may or may not be successful. But, here, counsel professed to believe that their abandonment of their client's challenge to admission of his confession

21

might mean that Judge Miller would grant them what amounted to a potentially undeserved favor on another, later legal position. Specifically, they believed the judge ultimately demonstrated his appreciation of their forbearance on the confession challenge when he accepted their argument for exception to an evidence bar under the rape shield statute. This calculus bothers us for two reasons. First, in a he said-she said sex crime case, especially one involving an alleged victim who is 13 years old, a confession from the defendant is one of the strongest pieces of evidence the State can possess. In fact, it can produce a conviction with no other support. It speaks far more loudly to a jury than the alleged sexual abuse victim's tangential and legal sexual conduct with an age peer. Second, in our courts, judges are charged with evaluating the merits of each legal argument presented by a party without fear or favor, and without regard for their affection for or patience with counsel representing that party. In other words, Judge Miller's oath forbade him from engaging in the kind of cynical tit-for-tat counsel testified that they expected from him. We cannot encourage this view of how judges operate by endorsing it as the basis of an acceptable strategy under the first prong of *Strickland*.

In sum, we do not share Judge Bosch's certainty that dispensing with a challenge to admission of Khalil-Alsalaami's partial confession was a necessary component of a legally or logically supported trial strategy or that any such challenge would have been hopelessly futile. Quite the opposite. On the undisputed testimony of Clark and Platt under the governing law as it had developed at that time, we hold that Khalil-Alsalaami received deficient representation pretrial and at trial.

*Prejudice*

We need not spend much time on the second prong of *Strickland* in this particular case.

22

Given Clark's admission during his testimony at the hearing on Khalil-Alsalaami's K.S.A. 60-1507 motion that the incriminating statements he and Platt failed to challenge were one of the two pillars of the State's case, we have no trouble in ruling that prejudice occurred. As *Strickland* makes clear, we are concerned with fundamental fairness and whether our confidence in the outcome of the prosecution has been undermined by counsel's deficient performance. *Strickland*, 466 U.S. at 696. Especially when we consider the jury's split verdict, we are persuaded there is a reasonable probability that suppression of Khalil-Alsalaami's confession would have led to acquittal on all three counts. See *State v. Overstreet*, 288 Kan. 1, 25-26, 200 P.3d 427 (2009) (trial counsel's failure to locate, question, and prepare witnesses for trial was ineffective assistance of counsel where primary theory of defense relied on those witnesses' testimony and jury clearly relied on one such witness' testimony to reach verdict). We know that the other pillar of the State's case, the DNA evidence for which the defense had a plausible explanation, did not carry the day alone on the rape count.

CONCLUSION

For all of the reasons explained above, we affirm the judgment of the Court of Appeals panel reversing Ziad K. Khalil-Alsalaami's convictions and remanding this case for further proceedings in the district court.

NUSS, C.J., and ROSEN, J., not participating.[1]

---

[1]**REPORTER'S NOTE:** Chief Justice Nuss heard oral arguments but did not participate in the final decision in case No. 115,184. Chief Justice Nuss retired effective December 17, 2019.

23

PATRICK D. MCANANY, Senior Judge, assigned.[2]

ERIC W. GODDERZ, District Judge, assigned.[3]

* * *

BEIER, J., concurring: I agree with the court's disposition and reasoning in this case. I write separately only to state that I would hold there was a second, glaring error by trial counsel—the failure to safeguard the defendant's statutory right to an interpreter. This at least imperiled, if it did not cripple, his ability to suppress his incriminating statements, as well his exercise of his constitutional rights to be present at all critical stages of the prosecution and to confront his accusers.

K.S.A. 75-4351 specifically states:

"A qualified interpreter shall be appointed . . . for persons whose primary language is one other than English . . . (b) in *any* court proceeding involving such person and such proceeding may result in the confinement of such person or the imposition of a penal sanction against such person; . . . (e) prior to *any* attempt to interrogate or take a statement from a person who is arrested for an alleged violation of a criminal law of the state." (Emphases added.)

[2]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 115,184 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[3]**REPORTER'S NOTE:** District Judge Godderz was appointed to hear case No. 115,184 vice Justice Rosen under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

24

It is undisputed that Khalil-Alsalaami's primary language is not English. Period. The plain language of K.S.A. 75-4351 entitled him to have an interpreter to assist him with questioning by law enforcement. It entitled him to have an interpreter with him in all court proceedings that were part of the prosecution whose goal was to imprison him. Native English speakers such as his trial counsel and the judge presiding over his trial were not equipped to determine otherwise merely because they interacted with him well enough to suit them. This is also true of the district judge who denied Khalil-Alsalaami's K.S.A. 60-1507 motion.

Before the district court on the motion, Khalil-Alsalaami presented abundant lay and expert testimony on his limited ability to understand English. He principally relied on constitutional presence and confrontation arguments rather than grounding his case on the failure of all involved to comply with the interpreter statute. Thus the district judge and the Court of Appeals panel spent most of their time and space examining and analyzing those arguments in relation to Khalil-Alsalaami's ineffective assistance claims. This is understandable. I further understand my colleagues' reluctance to address either statutory or related constitutional issues that need not be addressed to dispose of this appeal.

But I strongly suggest that, before parties and the courts build an extensive record on a defendant's actual facility with English next time, they first focus on what our Legislature has said simply and directly about the need for interpreters for suspects and defendants for whom English is not the primary language. This is just one step in the direction of the kind of heightened cultural sensitivity and unimpeachable fairness for all to which our justice system constantly—and appropriately—aspires.

Finally, because I would say there were two errors of constitutional magnitude by trial counsel, I also would hold that their cumulative effect was prejudicial under the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984). I would assume without deciding that *Strickland* applies. See *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 189 L. Ed. 2d 420 (2017).

MCANANY, S.J., joins the foregoing concurring opinion.

* * *

BILES, J., dissenting: This case boils down to an unanswered core question: Is it ineffective assistance of counsel to *not* file a motion to suppress evidence that most likely would have been denied? This is key because the alleged omission could not cause prejudice unless it would have succeeded. *Knowles v. Mirzayance*, 556 U.S. 111, 127, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009) (to establish prejudice from counsel's alleged unprofessional errors, the defendant "must show . . . there is a 'reasonable probability' that he would have prevailed on his insanity defense had he pursued it"); *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (when failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, "*the defendant must also prove that his Fourth Amendment claim is meritorious* and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice" [emphasis added]). My four colleagues voting for reversal sidestep this necessary inquiry and merely hold the contested motion was not "hopelessly futile." Slip op. at 22. The caselaw requires more. I dissent because when I do the analysis it renders a different result.

As I see it, the majority just springboards off its less-than-stellar characterization of the suppression issue's merits to find prejudice. But how does the one necessarily follow the other? Surely before reversing such serious convictions, we must consider whether the motion Khalil-Alsalaami believes his attorneys should have pursued would

26

have been successful in keeping his incriminating statements from the jury. The majority acts as though a Hail Mary pass in football always ends with a touchdown.

The caselaw supports me on this. See *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005) (noting that to succeed on *Strickland*'s prejudice prong, defendant "must show that he would likely have prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted"; criticizing the district court for improperly assuming the objection would have likely resulted in suppression); *Howard v. Bouchard*, 405 F.3d 459, 481 (6th Cir. 2005) (defendant failed to establish prejudice under *Strickland* because he did not show a suppression motion would have succeeded).

Admittedly, there is a bit of an analytical quandary in figuring out where this question fits under *Strickland*'s two prongs. This is because when there is no reasonable probability the result would have changed even if the evidence were excluded, courts will not find prejudice, regardless of the merits of any suppression claim. See *Still v. Lockhart*, 915 F.2d 342, 344 (8th Cir. 1990). But when, as here, the incriminating evidence was important to the prosecution, the merits must be scrutinized, rather than assumed. And when suppression would not have succeeded, a conviction should not be reversed—regardless of whether it is because failing to file a losing motion cannot be said to be deficient performance (*Strickland*'s first prong), or because it cannot be said to have prejudiced the defendant if it would have failed (the second prong). Courts have framed the problem both ways. See *Premo v. Moore*, 562 U.S. 115, 124, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011) (noting counsel's "first and independent explanation [for failing to move for suppression of defendant's confession]—that suppression would have been futile—confirms that his representation was adequate under *Strickland*, or at least that it would have been reasonable for the state court to reach that conclusion."); *United States v. Caggiano*, 899 F.2d 99, 104 (1st Cir. 1990) ("Because we have found that the seizure

27

of the firearms and their admission into evidence was proper, we conclude that defendant suffered no prejudice from his trial attorney's withdrawal of the motions to suppress, and thus, his ineffective assistance of counsel claim fails."); *United States v. Reiswitz*, 941 F.2d 488, 496 (7th Cir. 1991) (holding counsel's failure to file a pretrial motion to suppress defendant's spontaneous statements to police did not prejudice defendant when statements of that kind were not subject to suppression); *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) ("[W]hile it is arguably true, as Molina contends, that a defendant has 'everything to gain and nothing to lose' in filing a motion to suppress, it is not professionally unreasonable to decide not to file a motion so clearly lacking in merit.").

Regardless, the point is the analysis has to be done. And the path for doing it is clearly laid out. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Court noted that once an error is determined, a reviewing court then "presume[s] . . . the judge or jury *acted according to law*." (Emphasis added.) 466 U.S. at 694. As the *Strickland* Court explained,

> "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncra[s]ies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. *Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination*." (Emphasis added.) 466 U.S. at 694-95.

In Khalil-Alsalaami's case, this means we must decide whether there is a "reasonable probability" the district court would have granted the motion to suppress if that court acted according to the law. *Mirzayance*, 556 U.S. at 127. To do so, we must evaluate how a judge would have decided the abandoned motion under the applicable law, using the facts as found by the district court during the K.S.A. 60-1507 hearing. But what we cannot do is what the majority does—finding deficient performance based on a "what have you got to lose" philosophy, and then deciding prejudice by looking only at the evidence's significance to the prosecution. That fails to connect all the dots.

This is not unfamiliar territory. Appellate courts are experienced at deciding whether a trial court erred when granting or denying a motion to suppress incriminating evidence. See, e.g., *Caggiano*, 899 F.2d at 102-04 (analyzing each of defendant's claims as to why his motion to suppress would have been granted; concluding his claims would have failed). And the rules for appellate scrutiny are well known.

As to a trial court's suppression order,

> "'an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. . . . Substantial evidence refers to evidence that a reasonable person could accept as being adequate to support a conclusion. . . . This court does not reweigh the evidence, assess the credibility of the witnesses, or resolve evidentiary conflicts. [Citations omitted.]' *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017)." *State v. Brown*, 306 Kan. 1145, 1151, 401 P.3d 611 (2017).

In our current case, the attention is on Khalil-Alsalaami's waiver of his *Miranda* rights just before making incriminating statements about having sex with a 13-year-old girl. Again, the applicable law is well established.

29

"Under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. 'The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation.'" *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018).'"

If a defendant voluntarily waives *Miranda* rights, any subsequent inculpatory statement must still be voluntarily given. See *State v. Mattox*, 280 Kan. 473, 483, 124 P.3d 6 (2005) ("We acknowledge that the judicial determinations of the two issues usually are separate, i.e., one can make a voluntary waiver of his or her *Miranda* rights but still produce an involuntary confession."). And, in determining the voluntariness of both,

"[A] trial court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors:

"'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.'" *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013) (voluntariness of confession).

See also *Mattox*, 305 Kan. at 1042-43 (voluntariness of *Miranda* waiver).

Based on the testimony and evidence gleaned from the evidentiary hearing, the district court's 50-page order denying Khalil-Alsalaami's K.S.A. 60-1507 motion included factual findings bearing on these factors. And using those as our foundation, our focus is necessarily drawn to the majority's "less complicated route" for reversal, i.e., the failure to file the motion to suppress incriminating statements based on allegations that

30

Khalil-Alsalaami did not voluntarily waive his rights; and counsel's later failure to object to a journal entry stipulating his statements to police were voluntary and freely given. Slip op. at 3.

As to voluntariness, the district court held,

"A review of the facts readily demonstrates that [Khalil-Alsalaami's] statement to Detective Runyon was the product of his free and independent will. Thus, even if [Khalil-Alsalaami's attorney] had moved to suppress the petitioner's statement, it would have been unsuccessful. As a result, the petitioner has failed to show prejudice as a result of [Khalil-Alsalaami's attorney]'s decision not to challenge the voluntariness of the statement and his claim of ineffective assistance of counsel must also fail."

A court reviewing that conclusion must first decide whether the district court's basis is supported by substantial competent evidence. I believe it is in Khalil-Alsalaami's case.

To begin with, some findings are uncontroverted:  (1) Khalil-Alsalaami is a native of Iraq and his primary language is Arabic; (2) he worked as a U.S. Army interpreter from 2004 to 2009; (3) he came to the U.S. in April 2009 and worked more than eight months at Fort Riley training U.S. soldiers how to deal with his culture; and (4) he had lived in the U.S. for 14 months at the time of his arrest. These uncontroverted facts about his exposure to English necessarily inform any conclusion that Khalil-Alsalaami understood what was being asked of him about going ahead with police questioning. But there is more.

The district court also found as to Khalil-Alsalaami's English proficiency:

31

- The judge presiding over Khalil-Alsalaami's arraignment had observed Khalil-Alsalaami completed an indigency affidavit in English, and had participated in English during his first court appearance in English "and knew what was he was doing."

- During arraignment, Khalil-Alsalaami's attorney at that time advised the court his client understood English "fairly well" but had "some difficulty in understanding the nuances."

- During the *Jackson v. Denno* hearing, Khalil-Alsalaami's attorney told the court, "I don't think my client needs to have word for word translated by the interpreter."

- Officer Runyon testified at the *Jackson v. Denno* hearing that when he interviewed Khalil-Alsalaami without an interpreter when the incriminating statements were made that Khalil-Alsalaami's "English is very good," but noted "he could not read English."

- Barry Clark, Khalil-Alsalaami's trial attorney, testified he never had any concerns he should have used an interpreter.

As to that last item, the record reflects Clark was an attorney with over 30 years' experience in criminal practice, and had litigated "[h]undreds perhaps thousands" of trials and represented many defendants for whom English was not their first language. Clark testified he never had concerns about Khalil-Alsalaami needing an interpreter in his dealings with his client. This tells me that if Khalil-Alsalaami understood Clark during his representation, as Clark testified, the district court reached a supportable conclusion that Khalil-Alsalaami understood what the officers explained about his *Miranda* rights.

That brings us to the questioning itself, which was video recorded. In my estimation, this recording also provides substantial competent evidence supporting the

32

district court's findings about Khalil-Alsalaami's English proficiency, his ability to understand his waiver of rights before talking with investigators, and the voluntariness of his statements. The caselaw agrees. See *United States v. Alarcon*, 95 Fed. Appx. 954, 956 (10th Cir. 2004) (unpublished opinion) (acknowledging evidence presented at the suppression hearing "can support either a finding that [defendant] understood English or one that he did not," and so the issue of defendant's ability to comprehend the English *Miranda* warnings turned on the witnesses' credibility; upholding the district court's finding that defendant "did not understand the *Miranda* warnings" because an appellate court "will not substitute its own opinion of how the evidence should have been weighed for the district court's assessment of the proper weight of the evidence and of the credibility of witnesses"); *United States v. Marrero*, 152 F.3d 1030, 1034 (8th Cir. 1998) ("[T]he district court did not clearly err in finding that defendant could understand English and that he effectively waived his *Miranda* rights"; reasoning that "at all relevant times, defendant spoke in English . . . and that he never asked for an interpreter or indicated difficulty with the English language. Moreover, several law enforcement officers . . . testified about defendant's proficiency in English based upon their observations and conversations with him."); *United States v. Rodriguez-Mendoza*, No. 88-3036, 1989 WL 37279, at *1 (9th Cir. 1989) (unpublished opinion) (noting the informant and DEA agent testified they had negotiated with defendant in English with no difficulty, and defendant was informed of his *Miranda* rights in English and indicated in English that he understood those rights; holding the record was "more than sufficient to support the district court's determination that [defendant] possessed sufficient understanding to effectively waive his *Miranda* rights"); cf. *Oum v. Lewis*, No. 98-55276, 1998 WL 898127, at *1 (9th Cir. 1998) (unpublished opinion) (habeas corpus case; holding the district court did not err by denying defendant's claim that his waiver of *Miranda* rights and subsequent confession were neither knowing nor voluntary because of his lack of English-language proficiency and the absence of an interpreter; reasoning

"the record fairly supports the factual finding that Oum understood English");
*Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (habeas corpus case; "Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights. Campaneria's native tongue is Spanish. Nonetheless, the record, and in particular the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the Miranda warnings given to him.").

Obscuring the inquiry a bit, the majority blows a little smoke when it persists in portraying this interview as an "interrogation." Slip op. at 4, 6, 7, 8, 10, 16, 18, 20, 21. But let's not have that repetitive, pejorative branding conjure a different reality from what the recording shows. This police encounter was hardly intense, didn't last long, and was certainly not conducted under harsh conditions like a freezing room in the middle of the night with a bare lightbulb hanging from the ceiling. Indeed, there is a legitimate legal argument whether Khalil-Alsalaami was even in custody when he admitted having sex with his 13-year-old victim. The record shows he was not under arrest, not handcuffed, and either drove himself to the police station or was given a ride there.

In any event, the video documents a relaxed back and forth between Khalil-Alsalaami and the officers, with non-accusatory questioning that was short in duration before the incriminating statements were made, marked by at least two breaks for the officers to confer with their superiors, and multiple offers for refreshments and even more breaks. At most the first session lasted about 30 minutes, and the second 15 minutes. The interview occurred in the afternoon. See *State v. Harris*, 279 Kan. 163, 166-67, 172, 105 P.3d 1258 (2005) (rejecting defendant's claim the district court erred by allowing his confession to be admitted because it was not voluntary; holding the totality of

34

circumstances—even including the fact that "he was confined in a small room for nearly 7 hours while shackled to the floor"—supported the district court's finding the confession was voluntary). To be sure, the recording does not show Khalil-Alsalaami struggling with the English language while talking with officers, which is consistent with the district court's findings.

Importantly, investigators explicitly advised Khalil-Alsalaami of his *Miranda* rights before he made the incriminating statements. And the recording supports the district court's conclusion that Khalil-Alsalaami understood those rights before agreeing to talk with investigators. Officer Runyon told Khalil-Alsalaami:

- "[Y]ou have the right to remain silent. *Which means you don't have to talk if you don't want to*. Okay[?] That's one of your rights." (Emphasis added.)
- "[A]nything you say can and will be used against you in a court of law. So I'm going to have some questions for you. I just want you to be honest with me and just remember that when you answer the questions it can be used against you."

Officer Runyon and Khalil-Alsalaami also had an exchange about him having his own lawyer or one being appointed if he could not afford one. Runyon then asked, "You understand all of these rights, sir?" To which Khalil-Alsalaami responded, "Yes." The remainder of the recording reflects a mutually polite, free exchange of questions and responsive answers about what happened the evening in question—including Khalil-Alsalaami's descriptions about his sexual acts with the victim.

From all this, the district court found, "A review of the facts readily demonstrate that [Khalil-Alsalaami's] statement was the product of his free and independent will." This is a supportable conclusion based on the record. See *Yarborough v. Alvarado*, 541 U.S. 652, 667-78, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) ("[T]he voluntariness of a statement is often said to depend on whether 'the defendant's will was overborne.'"); see, e.g., *State v. Guein*, 309 Kan. 1245, 1264-65, 444 P.3d 340 (2019) (holding defendant's confession was involuntary when the armed officer told the defendant handcuffed behind his back "'[d]on't fuck with me'—when I 'ask you some questions here in a little bit' because 'I know what you're doing out here [a drug deal]' and 'I'm telling you right now, I know what's going on, all right?'"; reasoning under the totality of the circumstances, defendant "had better not be silent because that would show he was 'fuck[ing] around' and not 'be[ing] honest'" with the officer, and therefore the officer's "language implied physical violence toward [defendant], prompting his later incriminating statement").

The essential inquiry for the district court and reviewing courts is whether the totality of the circumstances establish the incriminating statements were the product of the free and independent will of the accused. *Randolph*, 297 Kan. at 326; *State v. Sharp*, 289 Kan. 72, 80, 210 P.3d 590 (2009). The record reflects that they were. Runyon explained in clear simple language that Khalil-Alsalaami did not have to talk to the officers "if you don't want to." And Khalil-Alsalaami said he was willing to continue. See *United States v. Washington*, 431 U.S. 181, 188, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977) ("[I]t seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.").

Given this record, Khalil-Alsalaami's involuntary-confession claim would not have succeeded, especially when the record reflects the district court's "actual" and "reasonabl[e]" decision-making process as described above. See *Strickland*, 466 U.S. at

36

695. Reversing these convictions as the majority does is not warranted. See *Belmontes v. Brown*, 414 F.3d 1094, 1121 (9th Cir. 2005) (requiring a reasonable probability that a motion to suppress evidence would have succeeded and that the suppression would have led to a different outcome at the trial). And given that, any disagreement about the negative impact of the stipulation or the undeveloped concern about compliance with K.S.A. 75-4351 fall to insignificance and would not justify reversal standing alone or in combination.

For these reasons, I dissent.

STEGALL, J., joins the foregoing dissenting opinion.