NOT DESIGNATED FOR PUBLICATION

No. 126,308

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ANTHONY WOOTEN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Submitted without oral argument. Opinion filed September 5, 2025. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ARNOLD-BURGER and BRUNS, JJ.

PER CURIAM: A jury convicted Michael Anthony Wooten on three counts: aggravated indecent liberties with a child, sexual exploitation of a child, and aggravated witness intimidation. Wooten appeals, raising challenges to the trial court's rulings on evidence suppression, confrontation rights, and the lack of multiple acts instructions. Finding no error, we affirm.

1

Thirteen-year-old J.A. endured a childhood rife with instability. Her Mother and Father provided scant stability. Mother moved J.A. frequently, including a stint in a homeless shelter, while Father, often incarcerated, was largely absent. At trial, Mother was in custody at Wyandotte County jail. Since she was about three or four years old, Michael Wooten filled the role of a stepfather to J.A.

J.A. often lived with her paternal grandparents, who sought to stabilize her upbringing and to care for her. Yet J.A. proved difficult—resisting rules, neglecting chores, and skipping school. In 2016, J.A.'s mother became concerned about text messages she discovered had been exchanged between J.A. and Wooten as well as social media posts. She took screenshots of the messages from J.A.'s phone and provided them to law enforcement. She also examined messages on Wooten's phone and made copies for law enforcement. In April 2017, on the recommendation of the Department for Children and Families, J.A. went to live with her grandparents in Shawnee. Soon, concerns emerged—a truck linked to Wooten appeared in the area, and in June, Grandpa encountered a man, presumed to be Wooten, in their garage. Evidence mounted— hundreds of texts between J.A. and Wooten's number, a photo of them on Grandpa's computer, and signs of Wooten's covert presence in the home.

The situation escalated when Grandma found Wooten locked in J.A.'s bathroom. Grandpa dialed 911, and Wooten fled through J.A.'s window before officers arrived. Detective Joseph Mazzei collected J.A.'s bed sheets for DNA analysis.

J.A. later moved to her maternal grandmother's home but repeatedly ran away, cycling through mental health facilities. The last time J.A. ran away, she reunited with Wooten. During a Missouri traffic stop, they fled police, crashed into a ditch, and were apprehended. Officers recovered cell phones and a laptop from the crash site. The

Johnson County District Court issued a search warrant for the contents of the cell phones and laptop.

The State charged Wooten with aggravated indecent liberties and sexual exploitation of J.A., later adding witness intimidation. Law enforcement examined the devices, uncovering photos of Wooten and J.A.—some innocuous, others depicting them undressed, engaged in kissing, and Wooten fondling J.A.'s exposed breasts—along with GPS coordinates pointing to J.A.'s home. Cell phone searches included: "What can AT&T see[,]" "13-year-old girl adult man Kansas charges," and "can Dad read my texts AT&T."

Mother, testifying remotely due to COVID, described her nine-year relationship with Wooten and laid the foundation to introduce text messages with Wooten. Mother and Detective Joshua Collins testified that text messages between Wooten and Mother revealed troubling comments about 12-year-old J.A.—messages with J.A. suggested sexual intimacy and secrecy.

The State introduced seven exhibits of recorded jail calls between Wooten and J.A.—though only playing three for the jury—supporting the aggravated witness intimidation charge, Count III. Detective Mazzei testified to their content: discussions of sexual activity, Wooten inquiring about pregnancy, Wooten pressing J.A. to keep to her story, Wooten not wanting to go to prison for a long time, and allusions to both of Wooten and J.A. committing suicide with statements like that if things go bad, he would "check out" and she could do the same thing and come to meet him. And during the State's opening, closing, and rebuttal statements about Count III—aggravated intimidation of a witness—the prosecutor emphasized a specific remark made by Wooten to J.A. during a jailhouse phone call. In that conversation, the prosecutor told the jury that Wooten urged J.A. to "[s]tick to [her] guns [and] don't say nothing."

3

J.A., testifying reluctantly, admitted Wooten took photos of her but denied knowledge of whether any of the pictures he took were taken without her clothes on. She also admitted to taking explicit self-photos and kissing and hugging Wooten but denied that Wooten threatened or intimidated her during the jail phone calls. She was not asked by either party explicitly whether an inappropriate relationship existed between her and Wooten, but after questioning by Wooten's counsel whether she wanted to "do this because [she] fe[lt] comfortable with [Wooten,] back when [she was] 13[,]" J.A. replied, "Yes."

DNA evidence bolstered the State's case. Semen on J.A.'s mattress cover and non-semen DNA on her sheets were found by the forensic biologist in the case to likely belong to Wooten.

The jury convicted Wooten of aggravated indecent liberties with a child, sexual exploitation of a child, and aggravated intimidation of a witness. He received two consecutive life sentences (two 25-year minimums) for the sex offenses and a concurrent 34-month term for intimidation.

Wooten now appeals.

ANALYSIS

I.     THE TRIAL COURT DID NOT ERR IN DENYING WOOTEN'S MOTION TO SUPPRESS

Wooten argues that the district court erred in denying his motion to suppress evidence from his cell phone and laptop seized by police at a crash site and later searched under the authority of a search warrant. He contests (1) the court's finding that he abandoned the devices, forfeiting his reasonable expectation of privacy, and (2) the initial seizure's legality absent an immediate warrant.

*Standard of Review*

We review a district court's denial of a motion to suppress evidence using a bifurcated standard:  factual findings are upheld if supported by substantial competent evidence, while the ultimate legal conclusion is reviewed de novo. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). Substantial evidence is what a reasonable person could accept as adequate. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). In reviewing the factual findings, an appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Sesmas*, 311 Kan. 267, 275, 459 P.3d 1265 (2020). When the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress the evidence is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The State bears the burden of proving that the search and seizure were lawful. *State v. Goodro*, 315 Kan. 235, 238, 506 P.3d 918 (2022). To have standing to seek suppression of evidence, defendants in criminal cases must satisfy their burden of showing a reasonable expectation of privacy in the searched area to challenge evidence. This requires showing ownership, possession of the property, or a personal interest in the premises or seized items. *State v. Scheuerman*, 314 Kan. 583, 593-94, 502 P.3d 502 (2022).

*Abandonment and Fourth Amendment Protection*

The Fourth Amendment to the United States Constitution, as applied through the Kansas Constitution, protects against unreasonable searches and seizures, but only where a defendant has a legitimate expectation of privacy. 314 Kan. at 593-94. Abandonment extinguishes that expectation, leaving no standing to challenge the search or seizure of the property. *State v. Grissom*, 251 Kan. 851, 902-03, 840 P.2d 1142 (1992). Kansas

5

courts assess abandonment objectively, focusing on whether a defendant's conduct—viewed in context—shows intent to relinquish control. Flight from police often signals abandonment, though intent remains key. The test for abandonment in the search and seizure context has two components: "(1) A defendant must intend to abandon the property; and (2) the defendant must freely decide to abandon the property and the decision must not merely be the product of police misconduct." *State v. Likins*, 21 Kan. App. 2d 420, 426, 903 P.2d 764 (1995).

Factors assessed objectively by actions and intent, not resulting from police misconduct, include: flight, denial of ownership, and physical relinquishment. Still, lawful possession, accidental loss, and efforts to recover property may negate abandonment. See 21 Kan. App. 2d at 426-27.

In *State v. Brunson*, 13 Kan. App. 2d 384, 390-91, 771 P.2d 938 (1989), this court held that a person fleeing police on foot, after abandoning their vehicle with the lights on and keys in the ignition, cannot still have a reasonable expectation of privacy in the vehicle's contents. Similarly, in *State v. Ralston*, 45 Kan. App. 2d 1024, 257 P.3d 814 (2011), the defendant was involved in a police pursuit in a stolen vehicle, which eventually crashed. She and another passenger fled on foot. This court held that Ralston had no expectation of privacy and could not challenge the search of her purse as she had abandoned the vehicle and later denied her presence in the vehicle or having any property in the vehicle. 45 Kan. App. 2d at 1027-29. In *Grissom*, 251 Kan. at 905-07, the Kansas Supreme Court ruled that Grissom had abandoned his car and no longer had a reasonable expectation of privacy. The vehicle was parked on private property without permission. Grissom slept in a nearby field, did nothing as the car was towed, and did not reclaim it. Instead, he stole another vehicle to evade arrest, showing he had given up any privacy interest in the seized vehicle.

Wooten argues that his case is distinguishable from *Brunson*'s deliberate abandonment or *Grissom*'s extended avoidance. He explains that his belongings were unintentionally lost in a crash, not purposefully left behind. While he acknowledges fleeing briefly, he insists he returned under the belief that his belongings remained in the truck. According to Wooten, his actions show an intent to retain, not abandon, his property.

But similar to *Grissom*, there is no evidence that Wooten attempted to claim ownership of the laptop or phones, he denied owning a laptop in several jail phone calls to J.A., and he did not claim ownership of the laptop until his motion to suppress hearing. Wooten counters that, like *Ralston*, there is no record that law enforcement asked him about his ownership of the cell phones or laptop. He contends, through his testimony at the suppression hearing, that he did not intend to abandon the items. He points to his return after being arrested several blocks away as evidence of retained interest, along with his belief they remained inside the truck, and his lack of memory seeing them on the street.

*Substantial competent evidence supports the district court's factual findings.*

There is substantial competent evidence in the record to support the district court's findings of fact that Wooten fled the scene of a police chase and crash, leaving the items outside the truck, either ejected during the crash or discarded. He made no effort to recover them and was arrested hours later near the crash site. The court highlighted that the truck, damaged in the crash, was towed for evidence without police misconduct. The court also found Wooten not to be credible when he claimed during the hearing that he was returning to the crash site to retrieve his property when he was arrested. We do not reweigh the evidence or assess the credibility of witnesses. *Sesmas*, 311 Kan. at 275.

*The district court correctly applied the abandonment doctrine in reaching its legal conclusion.*

The district court determined that Wooten had abandoned his laptop and cell phones, thereby forfeiting any expectation of privacy and eliminating the need for a warrant to seize them. Although Wooten later claimed ownership of the devices, the court concluded his actions showed abandonment.

In the context of search and seizure, determining abandonment involves two key factors. First, the defendant must show a clear intent to relinquish ownership or control of the property. Second, this intent must not be influenced by any form of police misconduct. *Likins*, 21 Kan. App. 2d at 426. Since substantial and credible evidence supports the district court's finding that no police misconduct occurred when the truck was towed, our task is to assess, de novo, whether the district court correctly applied its findings to determine that Wooten intended to abandon his laptop and cell phones.

First, in determining Wooten's objective intent to abandon, the district court acknowledged Wooten's permission to use his mother's truck, establishing a reasonable expectation of privacy, stating, "[p]resumably he had permission to be in." Unlike *Ralston*, where a stolen vehicle negated privacy expectations, Wooten's lawful possession aligns with *Likins*, where the defendant's sole act was to state that he could not give permission to search the car because it was not his. See *Ralston*, 45 Kan. App. 2d at 1029; *Likins*, 21 Kan. App. 2d at 426-27. The district court also heavily relied on Wooten's flight and two-hour absence, stating: "Wooten abandoned that property when he ran from the scene." Flight is a factor, but not dispositive, especially with lawful possession, accidental loss, and a return to the scene.

Wooten argues that the district court's focus on his flight equated accidental loss with intentional relinquishment. He contends that he was separated from his personal

8

property because of an accident, not because he intended to abandon his laptop and cell phones. The district court found the items were thrown from the truck either intentionally or during the crash, deeming this irrelevant. The district court explained: "[W]hether thrown . . . by Mr. Wooten or his passenger or thrown . . . in the course of the truck flipping . . . is not a distinction of real importance." While accidental loss from a crash does not inherently express an intent to abandon—unlike the intentional acts in *Ralston* (leaving behind a purse) or *Brunson* (abandoning a car)—the context of the accident remains significant. Here, the accident resulted from Wooten's deliberate attempt to evade a police pursuit, making the surrounding circumstances highly relevant. See *Ralston*, 45 Kan. App. 2d at 1025-26; *Brunson*, 13 Kan. App. 2d at 394.

The circumstances of Wooten's accident are directly relevant to assessing his intent. In *Brunson*, this court aligned with the United States Supreme Court's reasoning in *California v. Greenwood*, 486 U.S. 35, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988). Drawing on the principles established in *Greenwood*, this court held that an individual being pursued by police—who abandons their vehicle, flees on foot, leaves the lights on and the keys in the ignition, and is fully aware of the imminent arrival of law enforcement—cannot still assert a reasonable expectation of privacy in that vehicle. *Brunson*, 13 Kan. App. 2d at 390-95 (quoting *Greenwood*, 486 U.S. 39-41).

Similarly, Wooten attempted to evade law enforcement during a hot pursuit. After crashing his truck, he abandoned it and fled on foot, fully aware—just as Brunson was— that officers were close behind and would search the vehicle upon arrival.

Therefore, under these circumstances, the district court rightly determined that Wooten could not reasonably claim an expectation of privacy in the abandoned vehicle. Accordingly, the district court did not err in denying Wooten's motion to suppress.

II.    THE DISTRICT COURT DID NOT VIOLATE WOOTEN'S CONFRONTATION CLAUSE RIGHTS BY ALLOWING MOTHER TO TESTIFY REMOTELY

Wooten asserts the district court violated his confrontation rights under the Sixth Amendment to the United States Constitution by allowing Mother to testify remotely from jail due to a COVID-19 diagnosis. The court paused proceedings to weigh the issue, ultimately permitting her testimony via a large screen, with Wooten's counsel afforded full cross-examination. Wooten argues this arrangement denied him face-to-face confrontation. But the State defends it as a necessary accommodation.

*Standard of Review*

This court applies an unlimited standard of review for legal issues related to the Confrontation Clause under the United States and Kansas Constitutions. See, e.g., *State v. Belone*, 295 Kan. 499, 502-03, 285 P.3d 378 (2012). When a district court makes the required specific factual findings, this court may review the decision for clear error. *State v. Younger*, 320 Kan. 98, 107, 564 P.3d 744 (2025). If a violation of the Confrontation Clause occurs, it is subject to harmless error analysis, requiring the prosecution to prove beyond a reasonable doubt that the error did not influence the verdict. See, e.g., *State v. Bennington*, 293 Kan. 503, 524, 264 P.3d 440 (2011).

Wooten objected to Mother's remote testimony, citing confrontation rights, and the court overruled it. The issue is preserved.

*Confrontation Clause Principles*

The Sixth Amendment to the United States Constitution, incorporated through the Fourteenth, guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065,

13 L. Ed. 2d 923 (1965). Kansas applies this right under section 10 of its Bill of Rights, mirroring federal doctrine. Kan. Const. Bill of Rights, § 10.

Face-to-face confrontation is the ideal, ensuring reliability through physical presence and cross-examination. Yet this preference is not absolute—courts may limit it if (1) a significant public policy justifies the exception, and (2) the testimony retains reliability safeguards, like oath, cross-examination, and observability. *Maryland v. Craig*, 497 U.S. 836, 850, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). Further, Kansas Supreme Court Rule 145 (2025 Kan. S. Ct. R. at 223) allows electronic means for hearings and conferences, deferring to K.S.A. 60-243(a) for trials on the merits. And K.S.A. 60-243(a) mandates that witness testimony be taken in open court unless otherwise provided by law but allows remote testimony "[f]or good cause in compelling circumstances and with appropriate safeguards."

Kansas courts have recognized that exceptional circumstances, such as the COVID-19 pandemic, can justify remote testimony if it is necessary to further an important public policy and the defendant is afforded the opportunity for cross-examination. For example, recently, in *Younger*, the Kansas Supreme Court affirmed the trial court's decision to allow remote testimony via two-way live video exchange during the COVID-19 pandemic, noting that the witness had unique health concerns and did not want to travel due to the increasing number of breakthrough COVID-19 cases. The court emphasized that the defense had no problems communicating with the witness and engaged in a full cross-examination. *Younger*, 320 Kan. at 112.

Similarly, in *State v. Showalter*, 318 Kan. 338, 358-59, 543 P.3d 508 (2024), the court allowed remote testimony from a witness who could not travel due to international travel restrictions related to the COVID-19 pandemic. These cases demonstrate that courts have permitted remote testimony during the pandemic when justified by health

11

concerns and travel restrictions, provided that the defendant's right to cross-examine the witness is preserved.

*District Court's Analysis and Specific Findings*

The district court allowed remote testimony due to extraordinary circumstances, balancing public policy and procedural safeguards against Wooten's confrontation rights. Key factors included the COVID-19 pandemic disrupting court operations, Wooten's prolonged custody of over four years, and Mother's unavailability after she tested positive for COVID-19. Public policy prioritized the safe resumption of trials, aligning with administrative orders to minimize in-person hearings. Safeguards ensured fairness, including advanced Zoom technology, identity verification, controlled testimony conditions, and measures to facilitate cross-examination and juror observation. These steps aimed to uphold confrontation rights while addressing practical challenges. The key considerations and specific findings are:

1. Compelling Circumstances: The district court identified multiple extraordinary circumstances justifying remote testimony.

• COVID-19 Pandemic: Described as a "once-in-a-century calamity," the pandemic disrupted court operations for nearly two years, with jury trials suspended from March 2020 until May 2021 due to public health risks and administrative orders. The district court noted ongoing uncertainties with variants and vaccination efficacy, heightening safety concerns.

• Wooten's Circumstances: The district court noted that he had been in custody for 1,522 days (since October 9, 2017), primarily in solitary confinement, and the case was the oldest pending in the division. Prior trial settings were postponed due to the pandemic and counsel changes, with the most recent trial date (May 4, 2020)

12

canceled by administrative orders. Jeopardy had attached, making further delay impractical.

• Witness' Unavailability:  Mother tested positive for COVID-19, discovered fortuitously before her in-person appearance, precluding her presence in court under public health protocols. This health risk aligns with the Kansas Supreme Court and local administrative orders prioritizing safety for jurors, staff, and participants.

These factors collectively established compelling circumstances, distinguishing this case from routine applications of K.S.A. 60-243(a).

2. Public Policy Considerations:  The district court emphasized the public policy of resuming jury trials safely during the pandemic, administrative orders, and acknowledging Rule 145 and K.S.A. 60-243(a). These orders prioritized juror and participant safety, requiring courts to minimize in-person hearings except in special circumstances, such as jury trials. The district court explained that allowing remote testimony aligned with this public policy by preventing potential COVID-19 exposure in the courtroom was particularly critical given Mother's contagious status. The district court also noted the State's interest in presenting noncumulative foundational evidence, balanced against Wooten's right to a timely trial after significant delays.

3. Safeguards to Protect Confrontation Rights:  The district court implemented several safeguards to approximate in-person testimony and ensure fairness:

• Technology and Access:  The district court utilized the new courthouse's advanced Zoom capabilities with IT support to mitigate technical issues. Mother was to testify from a controlled location in Wyandotte County, within Kansas' jurisdiction, ensuring compliance with court orders.

13

• Verification Procedures:  The district court planned to confirm Mother's identity, ensure she was alone and free from external influence, and verify that she had no unauthorized documents. These inquiries mirrored protocols developed for remote testimony during the pandemic.

• Document Access:  Both parties were directed to provide relevant exhibits (e.g., photographs) to Mother in advance via the sheriff's department, facilitating examination and cross-examination. Screen-sharing was planned as a backup, subject to technical feasibility.

• Jury Observation:  The district court noted that Zoom's display on courtroom screens could enhance jurors' ability to assess Mother's demeanor, potentially compensating for her physical absence, though it acknowledged the different "aura" of in-person testimony.

These safeguards were designed to replicate the functional elements of confrontation—observation, cross-examination, and oath—while addressing the practical constraints of Mother's unavailability.

*Constitutional Balancing*

The record shows a district court decision guided by deliberation and care. The witness tested positive for COVID-19 at the time of the trial. The district court paused to assess options, then allowed her testimony via video on a large screen. Wooten's counsel cross-examined her thoroughly, and the jury observed her demeanor. She testified to her nine-year relationship with Wooten and provided the foundation for incriminating texts, critical to the State's case.

14

Further, she testified under oath, subject to perjury penalties. Wooten's counsel cross-examined her without restriction, probing her statements. The large screen allowed the jury to assess her demeanor—facial expressions, tone, and reactions—mirroring in-person observation. The setup satisfied *Craig*'s safeguards. See *Craig*, 497 U.S. at 850-51.

Yet despite the remote testimony satisfying *Craig*'s safeguards, Wooten challenges the lack of physical presence, claiming it undermined his rights. He draws on *Dowdell v. United States*, 221 U.S. 325, 330, 31 S. Ct. 590, 55 L .Ed. 753 (1911), and *California v. Green*, 399 U.S. 149, 157, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970), to emphasize the importance of face-to-face confrontation under the Confrontation Clause, asserting it was violated when Mother testified remotely during the pandemic.

But he overlooks *Craig*, 497 U.S. at 850, where the United States Supreme Court ruled that face-to-face confrontation can be limited if justified by significant public policy and if testimony retains reliability safeguards like oath, cross-examination, and jury observation. He also fails to distinguish his situation from *Younger*, 320 Kan. at 112-13, where the Kansas Supreme Court affirmed a district court's decision to allow remote testimony during the COVID-19 pandemic in circumstances similar to his case. Nor does he consider Rule 145 or K.S.A. 60-243(a), which guide remote testimony procedures.

The district court carefully weighed Wooten's Sixth Amendment confrontation rights against the necessity of remote testimony. It distinguished this case from scenarios involving the alleged victim's testimony, noting Mother's primarily foundational role, though subject to broader cross-examination on issues like her relationship with Wooten and J.A. The court acknowledged Rule 145 and K.S.A. 60-243(a). It also took judicial notice of the challenges associated with remote examination, e.g., technical difficulties. Still, it found the available technology sufficient, drawing on its experience with remote testimony in other hearings during the pandemic.

15

Thus, the district court's decision to allow remote testimony was a reasoned exercise of discretion under K.S.A. 60-243(a), supported by compelling circumstances (pandemic, Wooten's prolonged custody, and Mother's unavailability) and tailored safeguards to protect confrontation rights. The district court's pause to evaluate options reflects reasoned judgment, not caprice. Wooten's right to confront is not absolute. The district court acknowledged the constitutional weight of the decision while prioritizing public health and trial continuity. The ruling reflects a pragmatic response to unprecedented circumstances.

Therefore, Wooten's Confrontation Clause rights were not violated when the district court allowed J.A.'s Mother to testify remotely due to testing positive for COVID-19.

III.    WOOTEN FAILED TO DESIGNATE A RECORD THAT ESTABLISHES HIS CLAIM OF ERROR RELATED TO HIS CLAIM OF MULTIPLE ACTS

Finally, Wooten contends the district court erred by not giving a multiple acts instruction for Count III—aggravated intimidation of a witness—depriving him of a fair trial. He argues the State presented evidence of several distinct acts (jailhouse phone calls) that could support the charge, risking a nonunanimous verdict. Wooten also contends that the presence of a unified defense does not preclude reversal. He claims that while his primary defense focused on the absence of intent, he also put forth a secondary defense, admitting potential guilt for a lesser offense—violating a court order. This, he argues, demonstrates that the State overcharged him.

But the party alleging an error occurred has the burden of designating a record that establishes the claimed error. Without such a record, an appellant's claim of error fails. *State v. Liles*, 313 Kan. 772, 783, 490 P.3d 1206 (2021); see Kansas Supreme Court Rule 6.02(a)(4), (a)(5) (2025 Kan. S. Ct. R. at 36) (appellant has the burden to furnish a

16

sufficient record to support the claims of error; appellant's claims of error must be supported with specific citations to the record on appeal).

The State correctly notes that while Wooten argues the jailhouse phone calls he made to J.A. were separate and distinct acts, each of which could form the basis for the charge of aggravated intimidation of a witness, he does not explicitly cite to the record where multiple acts occurred. Wooten references only a single citation to the record about State's Exhibit 40, which Detective Collins testified about. This exhibit contained screenshots of text conversations between Wooten and J.A.'s Mother and is irrelevant to his argument that the court erred by failing to give a multiple acts instruction. The only other citations to the record that Wooten makes are not to any evidence or exhibits but to his defense counsel's closing argument. Thus, the State contends that because Wooten has not complied with Rule 6.02(a)(4), this court should deny his claim. We agree.

Wooten failed to establish his claim of error with precise citations to the record on appeal that show his claimed error as required under Rule 6.02(a)(4) and (a)(5). Thus, we "may presume that a factual statement made without reference to volume and page number has no support in the record on appeal." Rule 6.02(a)(4) (2025 Kan. S. Ct. R. at 36).

This result may sound harsh. But our Supreme Court has increasingly stressed the importance of strict compliance with Supreme Court Rules, regardless of the result. See *Schutt v. Foster*, 320 Kan. ___, 572 P.3d 770, 772 (2025) (when appellants raise issues for the first time on appeal, Rule 6.02[a][5] requires that they brief an exception to the preservation rule in their opening brief). Failure to comply with Supreme Court Rules prohibits consideration of the issue, regardless of whether it has any merit. The Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022).

17

*Conclusion*

Because Wooten could not reasonably claim an expectation of privacy in the abandoned vehicle, the district court did not err in denying Wooten's motion to suppress. The victim's mother's remote testimony, due to COVID-19, upheld Wooten's right to confrontation. And finally, Wooten abandoned his claim of error related to a multiple acts instruction when he failed to provide precise citations to the record where the error occurred as required under Rule 6.02(a)(4) and (a)(5).

Affirmed.